UNIVERSITY OF ILLINOIS, Plaintiff-Appellee, v. CONTINENTAL CA-
SUALTY COMPANY, Defendant-Appellant.

Fourth District No. 4—92—0121

Opinion filed September 3, 1992.

Michael P. Tone and T. David Ackerman, both of Peterson & Ross, of Chicago, and Mark S. Lipton, of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, P.C., of Champaign, for appellant.

Ronald S. Betman, of Katten, Muchin & Zavis, of Chicago, and William J. Brinkmann, of Thomas, Mamer & Haughey, of Champaign, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendant Continental Casualty Company appeals from a partial summary judgment entered in the circuit court of Champaign County in favor of plaintiff University of Illinois (University) on counts I, III, V, VIII, IX, X, and XIII of plaintiff's complaint for breach of contract based on a board of education liability (BEL) insurance policy. The trial court found there was no just reason to delay enforcement or appeal, thereby providing this court the jurisdiction to consider the appeal pursuant to Supreme Court Rule 304(a). 134 Ill. 2d R. 304(a).

The issues presented for review are as follows: (1) whether the summary judgment in favor of plaintiff and against defendant is precluded because there are genuine issues of material fact regarding defendant's coverage under the BEL insurance policy for settlement of or judgment on claims or for the defense costs incurred relating to claims arising out of (a) employment, (b) intentional misconduct, (c) discrimination, and (d) emotional distress and loss of reputation, or for claims of which the plaintiff provided late notice of the claim to defendant; and (2) whether summary judgment was improper because defendant is entitled to allocate costs of defense between covered and noncovered claims as a matter of law, or whether a genuine issue of

material fact exists with regard to that question. We affirm in part, reverse in part, and remand with directions.

## I. GENERAL PRINCIPLES REGARDING SUMMARY JUDGMENT

■ Pursuant to section 2–1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2–1005), a party may move for summary judgment and may file supporting affidavits. The opposing party may file counteraffidavits. In addition to the affidavits, the trial court may consider the pleadings, depositions and admissions to determine whether any genuine issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law. This procedure allows the trial court to determine if a genuine issue of material fact exists, but not to try the issue. While summary judgment facilitates the prompt disposition of lawsuits, it is a drastic remedy allowed only when the moving party's right to it is clear and free from doubt. In determining the propriety of granting summary judgment, the trial court should construe pleadings, depositions, admissions, exhibits, and affidavits strictly against the movant and liberally in favor of the respondent. Although inferences may be drawn from undisputed facts, an issue should be decided by the trier of fact and summary judgment denied where reasonable persons could draw divergent inferences from the undisputed facts. (*Pyne v. Witmer* (1989), 129 Ill. 2d 351, 357-59, 543 N.E.2d 1304, 1307-08.) In reviewing the granting of summary judgment, the role of the reviewing court is to determine if the trial court correctly ruled that no genuine issue of material fact exists, and if none exists, whether judgment was correctly entered for the moving party as a matter of law. (*O'Hara v. Holy Cross Hospital* (1989), 185 Ill. App. 3d 694, 699, 542 N.E.2d 11, 14, *aff'd* (1990), 137 Ill. 2d 332, 561 N.E.2d 18.)

> "The entry of summary judgment is not a matter within the discretion of the trial court. In reviewing a trial court's ruling on a motion for summary judgment, the appellate court should consider anew the facts and law related to the case and determine whether the trial court was correct." (*Shull v. Harristown Township* (1992), 223 Ill. App. 3d 819, 824, 585 N.E.2d 1164, 1167.)

Where the matter or issue may be decided as a question of law, such as where the only issue concerns the construction of an insurance policy, including its exclusionary provisions, summary judgment is a proper remedy. *Johnson v. American Family Mutual Insurance Co.* (1990), 193 Ill. App. 3d 794, 799, 550 N.E.2d 668, 672;

*Rockford Mutual Insurance Co. v. Schuppner* (1989), 182 Ill. App. 3d 898, 902, 538 N.E.2d 732, 735.

## II. FACTS

Plaintiff alleged in its multicount first-amended complaint breaches of contract on the part of defendant in failing to pay defense costs and settlements and judgments in several cases against it. Those allegations pertinent to the appeal will be summarized.

### A. *Count I*

In September 1979, Warren Craft and Louise A. DeSalle, two black medical students, failed "senior certifying examinations" and filed suit for racial discrimination in the United States District Court for the Northern District of Illinois (case No. 79—C—3521). Following a jury trial, a verdict was returned in favor of the University. The judgment entered therein was later affirmed by the Seventh Circuit. (*Craft v. Board of Trustees of University of Illinois* (7th Cir. 1986), 793 F.2d 140.) However, in defending the suit, the University incurred fees and expenses of $190,469.53 plus interest, of which plaintiff claimed $185,469.53 was due and owing from defendant.

### B. *Count III*

On May 17, 1980, Mariangela Segre filed a complaint with the Equal Employment Opportunity Commission (EEOC) based on allegations of sex discrimination leading to her dismissal as a professor at the veterinary school of medicine. On July 2, 1982, Segre filed a complaint alleging counts of sex discrimination and breach of contract in the United States District Court for the Central District of Illinois (case No. 82—2219). Notice of the suit was provided to defendant. On February 11, 1986, the lawsuit was settled for $130,000 and the EEOC complaint was settled for $5,000. Although defendant issued a letter on August 20, 1985, denying coverage, it did provide settlement authority prior to the settlement. Plaintiff University incurred $57,438.72 in defense fees and expenses and demanded reimbursement from defendant of $187,438.72 plus interest.

### C. *Count V*

On April 21, 1982, Leonard Robbins, a former assistant professor in the school of urban sciences, filed a complaint in the Cook County circuit court (case No. 82—CH—3226) seeking reinstatement with full tenure. On November 24, 1983, the suit was dismissed.

Defense fees and expenses totalled $13,659.79, and plaintiff University alleged that reimbursement due and owing from defendant amounted to $8,659.79 plus interest.

### D. *Count VIII*

On November 2, 1983, Joyce A. Phares, a former medical records technician, filed suit in the United States District Court for the Central District of Illinois (case No. 83—2456), alleging violation of her first and fourteenth amendment rights and emotional distress. On April 16, 1987, a directed verdict was entered in favor of the University, which incurred $72,008.76 defense fees and expenses. According to the University, the amount due and owing from defendant was $67,008.76 plus interest.

### E. *Count IX*

On August 23, 1984, three University police officers filed suit in the United States District Court for the Northern District of Illinois (case No. 84—C—7301), alleging violation of their constitutional rights under the fifth and fourteenth amendments because they were not hired to work a function at the University of Illinois, Chicago Pavilion. This case is identified as the "Jania suit." On May 3, 1985, this suit was dismissed. The University incurred defense fees and expenses of $12,668.74, of which $7,668.74 plus interest was alleged to be due and owing from defendant.

### F. *Count X*

On July 10, 1980, Clarice E. Mills, a former University Hospital employee, filed a sex discrimination claim before the Illinois Human Rights Department (case No. 1980—CF—0234), alleging civil rights violations and seeking reinstatement, damages, and attorney fees. On September 1, 1981, the dispute was settled for $8,041.04, and the University incurred $8,943.76 in defense fees and expenses. Plaintiff University claimed $11,984.80 plus interest was due and owing from defendant.

### G. *Count XIII*

On December 21, 1983, John W. Jones, a former medical student who failed his senior comprehensive examination four times, brought suit alleging discrimination predicated on violations of civil and constitutional rights in the United States District Court for the Northern District of Illinois (case No. 83—C—9344). In February 1988, the cause was dismissed. The University incurred $172,863.13

in defense fees and expenses, and alleged $167,863.13 plus interest was due and owing from defendant.

## H. *The Policy*

The subject policy went into effect on November 5, 1975, and its operation was renewed twice so that it remained in effect through December 1, 1984. The maximum annual aggregate limit of liability was $2 million, with $5,000 retention (deductible) per loss.

No duty to defend was created by this policy. Instead, the defendant agreed to pay all losses arising from any claim or claims for any wrongful act occurring during the policy period which was made against the assureds for which they became legally obligated to pay or for which the University, as the designated school district, may be required or permitted to reimburse such assureds, or for all losses which the University became legally obligated to pay for claims against it for wrongful acts.

Among the definitions included in the policy were those for "wrongful act" and "loss":

> "Wrongful Act shall mean any actual or alleged errors or misstatement or misleading statement or act or omission or neglect or breach of duty by the Assureds in the discharge of their duties, individually or collectively, or any matter claimed against them solely by reason of their being or having been Assureds during this policy period."

> "Loss shall mean any amount which the Assured or School District are legally obligated to pay, including, but not limited to any amounts which the School District may be required or permitted to pay as indemnity to an Assured, for a claim or claims made against an Assured for a Wrongful Act and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation and defense of legal actions (excluding from such costs of investigation and defenses, salaries of officers or employees of the School District or any other governmental body) claims or proceedings and appeals therefrom, costs of attachment or similar bonds, provided always, however, such subject of loss shall not include fines imposed by the law, or matters which shall be deemed uninsurable under the law pursuant to which this policy shall be construed."

The relevant exclusions to the policy read as follows:

"IV. Exclusions:

\* \* \*

(b) The Insurer shall not be liable to make any payment for loss in connection with any claim against the Assureds, and/or the School District,

(1) which is insured by another valid policy or policies except as provided in (4);

\*\*\*

(3) for any damages, direct or consequential, arising from bodily injury, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use thereof;

(4) for false arrest, libel, slander, defamation of character, invasion of privacy, wrongful eviction, assault or battery, except insofar as may be insured under any other valid policy or policies and then only in excess of such insurance.

\*\*\*

(6) For any amounts due, under the terms of any contractual obligation; however, except with respect to construction or demolition contracts this exclusion shall not apply to fees, costs and expenses of the investigation, defense or appeal of any claim or suit or arbitration or administrative proceedings resulting from failure to perform or breach of any contract."

The provisions relating to costs, charges, and expenses make it clear that this policy does not provide a duty to defend, although defendant may choose to advance costs and fees. The insureds have the opportunity to "select and retain legal counsel to represent them in the defense and appeal of any claim, suit, action or proceeding covered under this policy, but no fees, costs or expenses shall be incurred or settlements made, without the Insurer's consent, such consent not to be unreasonably withheld." Among the notice provisions of the policy was the following paragraph:

"The School District, or the Assureds shall, as a condition precedent to their rights under this policy, give the Insurer notice in writing of any claim made and shall give the Insurer such information and cooperation as it may reasonably require."

There was a continuity of coverage endorsement to the 1981-84 policy, which provided:

"IN CONSIDERATION of the premium for which this policy is renewed, it is agreed that if, during this policy period any claim or claims are made for a wrongful act subsequent to November 5, 1975, the Insurer will consider such wrongful act to have taken place during this period. It is further agreed the Retention and Limit of Liability applicable is that Retention and Limit of Liability in effect at the time claim is made."

There was also a "Clarification Endorsement" to the 1981-84 policy as follows:

"Nothing in this policy shall be construed to insure loss arising out of or in any way attributable to:

1) any failure to integrate or desegregate the student enrollment or participation in any school district, school or educational or extra-curricular program on the basis of race, ethnic background or national origin, or,

2) the bussing or other transportation of students to or from schools or extra-curricular events in connection with a program or plan of such integration or desegregation, or,

3) causing or allowing the student enrollment or participation in any school district, school or education or extra-curricular program to be operated or administered on a discriminatory basis because of race, ethnic background or national origin."

## I. *Trial Court's Judgment and Overview of Challenges Raised on Appeal*

The trial court entered summary judgment in the following amounts on each of the respective counts:

"Count I—$199,738.00; Count III—$187,438.00;
Count V—$8,659.00; Count VIII—$66,622.00;
Count IX—$7,688.00; Count X—$11,984.00; and
Count XIII—$169,099.00."

With the exception of challenging coverage, no argument is made that these figures inaccurately reflect the damages recoverable under each count. The following chart sets forth which arguments apply to the underlying cases.

| Claim | Allegations | Indemnification | Alleged Exclusion |
|---|---|---|---|
| Craft/DeSalle (students) | racial discrimination | fees | "intentional act" |
| Segre (employee) | sex discrimination | settlement, fees | contract exclusion, defamation exclusion, "intentional act," bodily injury exclusion, "loss," notice |
| Robbins (employee) | injunction against rights violations | fees | "intentional act," contract exclusion |
| Phares (employee) | constitutional rights | fees | "intentional act," bodily injury exclusion, defamation exclusion, other insurance, contract exclusion |
| Jania (employee) | constitutional rights | fees | "intentional act," contract exclusion |
| Mills (employee) | sex discrimination | settlement, fees | contract exclusion, "loss" |
| Jones (student) | racial discrimination | fees | "intentional act," clarification endorsement, notice |

### III. CONSTRUCTION OF INSURANCE CONTRACTS

"Contracts of insurance are subject to the same rules of construction as are applicable to other types of contracts. When construing an insurance contract, the primary objective is to give effect to the intent of the parties as expressed by the terms of the agreement. (*International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.* (1988), 168 Ill. App. 3d 361, 370, 522 N.E.2d 758.) If the language is ambiguous, it is to be construed in favor of the insured and against the insurer, as the drafter of the document; however, if the language of the policy is clear and unambiguous, it will be applied as written. (*United States Fire Insurance Co. v. Schnackenberg* (1981), 88 Ill. 2d 1, 429 N.E.2d 1203; *International Minerals & Chemical*

*Corp.*, 168 Ill. App. 3d at 371.) When interpreting an insurance contract, the court should neither distort the meaning of words so as to reach a desired result, nor search for or invent ambiguities where none exist. Rather, the court should examine the policy as a whole and interpret words according to their plain and ordinary meanings. (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 475 N.E.2d 872; *International Minerals & Chemical Corp.*, 168 Ill. App. 3d at 371.) Finally, when an insurer attempts to limit liability by excluding coverage under certain circumstances, it has the burden of showing that the claim falls within the exclusionary language on which it relies. *Strzelczyk v. State Farm Mutual Automobile Insurance Co.* (1985), 138 Ill. App. 3d 346, 485 N.E.2d 1230, *aff'd* (1986), 113 Ill. 2d 327, 497 N.E.2d 1170.

\* \* \*

\*\*\* The law presumes that the insured intended to obtain coverage and that the insurer would have stated all exclusions clearly and specifically. (*Strzelczyk v. State Farm Mutual Automobile Insurance Co.* (1985), 138 Ill. App. 3d 346, 485 N.E.2d 1230, *aff'd* (1986), 113 Ill. 2d 327, 497 N.E.2d 1170.)" (*International Surplus Lines Insurance Co. v. Pioneer Life Insurance Co.* (1990), 209 Ill. App. 3d 144, 148-50, 568 N.E.2d 9, 11-12.) While the insured has the burden of proving that the loss falls within the terms of the policy (*Miner v. Bray* (1987), 160 Ill. App. 3d 241, 244, 513 N.E.2d 580, 582), if that is established the insurer has the burden of proving the applicability of exceptions to coverage. *St. Michael's Orthodox Catholic Church v. Preferred Risk Mutual Insurance Co.* (1986), 146 Ill. App. 3d 107, 109, 496 N.E.2d 1176, 1178.

■ If the court finds there is an ambiguity, extrinsic evidence may be considered to determine the meaning of the words employed in the contract. (*International Surplus Lines Insurance Co.*, 209 Ill. App. 3d at 151, 568 N.E.2d at 12.)

"An insurance policy is not to be interpreted in a factual vacuum; it is issued under given factual circumstances. What at first blush might appear unambiguous in the insurance contract might not be such in the particular factual setting in which the contract was issued. *Jensen v. New Amsterdam Insurance Co.* (1965), 65 Ill. App. 2d 407, 415." (*Glidden v. Farmers Automobile Insurance Association* (1974), 57 Ill. 2d 330, 336, 312 N.E.2d 247, 250.)

In *Glidden*, the insured purchased three distinct policies from the insurer. In interpreting the "other insurance" clauses therein, the Illi-

nois Supreme Court found it improbable that the insured would pay premiums on three policies while contemplating that coverage would effectively be reduced to what would have been provided under one policy. (*Glidden*, 57 Ill. 2d at 336, 312 N.E.2d at 250.) In *International Surplus Lines Insurance Co.*, the court made a similar policy statement:

> "Finally, we are of the opinion that a stronger and more fundamental policy of Illinois is that when payment of a premium is made by an insured and accepted by the insurance company and coverage is promised in return therefor, the insurer should be required to fulfill its contractual obligations. See, *e.g.*, *Strzelczyk v. State Farm Mutual Automobile Insurance Co.* (1986), 113 Ill. 2d 327, 497 N.E.2d 1170; *Kaufmann v. Economy Fire & Casualty Co.* (1979), 76 Ill. 2d 11, 389 N.E.2d 1150." (*International Surplus Lines Insurance Co.*, 209 Ill. App. 3d at 157, 568 N.E.2d at 17.)

In the case at bar, plaintiff paid premiums of $19,500, $23,400, and $52,000 for the policies in question.

> "It is well settled under the law of Illinois, as well as most other jurisdictions, that if an insurer does not intend to insure against a risk which is likely to be inherent in the business of the insured, it should specifically exclude such risk from the coverage of the policy." *Bremen State Bank v. Hartford Accident & Indemnity Co.* (7th Cir. 1970), 427 F.2d 425, 427, quoted in *Martin v. Brunzelle* (N.D. Ill. 1988), 699 F. Supp. 167, 170.

Defendant attempts to distinguish this contract to indemnify against legal costs, settlements and judgments from other types of insurance policies which it describes as "liability policies." However, all insurance policies are contracts of indemnity, although various policies may cover different types of losses. (22 Ill. L. & Prac. *Insurance* §2 (1956).) The same rules of construction apply in construing contracts of indemnity as have been previously described. (21 Ill. L. & Prac. *Indemnity* §12 (1977)), and therefore defendant's attempted distinction does not impact general principles of construction.

## IV. EMPLOYMENT-RELATED CLAIMS

■ Defendant alleges these claims are barred by exclusions to the policy relating to judgments on or settlements of breach of contract claims. In addition, defendant argues that a settlement or judgment involving an employment claim does not constitute a loss. These arguments affect the claims of Segre, Robbins, Phares, Mills, and the three officers in the Jania case.

Settlements of and judgments on breach of contract actions, generally, are excluded under clause IV(b)(6) of the policy. We have reviewed the cases cited by the parties on this question and find several of them distinguishable or without precedential value. In deciding this question, we rely on *New Madrid County Reorganized School District No. 1 v. Continental Casualty Co.* (8th Cir. 1990), 904 F.2d 1236, and *Convent of Visitation School v. Continental Casualty Co.* (D. Minn. 1989), 707 F. Supp. 412. In *Convent of Visitation*, the school had been sued for a claim of marital discrimination by an employee who was fired when his wife quit her job. The case, which was brought pursuant to a Minnesota statute, was settled. In denying coverage, Continental raised exclusion IV(b)(6). In rejecting Continental's argument, the court noted that a statutory action independent of any contractual remedy was involved in the underlying case. *Convent of Visitation,* 707 F. Supp. at 414-15.

In *New Madrid,* the school district was sued by 10 current and former teachers in a section 1983 action (see 42 U.S.C. §1983 (1982)) for violation of first amendment rights through involuntary reassignment and denial of certain contractual benefits in retaliation for joining a particular educational association. On the issue of the IV(b)(6) exclusion, the court had this to say:

"Continental Casualty submits that the teachers' action against the School District essentially sought to redress the School District's breach of its employment relationship with the teachers in that they complained of wrongful termination and transfers and sought such remedies as back wages and other contractual benefits.

We reject this argument. It is clear that the teachers' suit sought to redress violations of constitutional rights and, even though some of the remedies sought resembled contract-type remedies, the suit simply cannot fairly be characterized as a suit for breach of contract. Any suit between teachers and their school district will to some extent involve complaints or remedies that emanate from the parties' contract. That does not mean, however, that all such suits are breach of contract suits. We note that the teachers' action was brought in federal court pursuant to 42 U.S.C. §1983 because of the First Amendment issues involved. Had the suit been based only on breach of contract it would have involved purely state law questions and would not have been cognizable in federal court, absent diversity.

We hold that the teachers' suit against the School District was a suit to vindicate constitutional rights and was not excluded by paragraph IV(b)(6) of the policy." *New Madrid*, 904 F.2d at 1241.

■ Defendant contends that settlement of or judgment on employment claims are not a "loss" within the definition of the policy since they encompass amounts the insured is otherwise obligated to pay anyway. *Convent of Visitation* rejected this argument, concluding that the headmaster's discharging of the employee was a violation of the Minnesota statute and a wrongful act under the policy and, therefore, the settlement of the claim was a loss. Defendant in this case argues that had the employees involved not been improperly treated by the insured, the insured would have been obligated to pay the sums to the employees which the court ordered them to pay. So, according to defendant, there is no loss. But of course there is a loss because the insured paid someone else to fill those jobs and will now, because of the settlement or judgment, be required to pay double.

Defendant cites a number of cases to support its theory that if it pays plaintiff under the policy, plaintiff will be unjustly enriched. However, defendant never seems to explain how plaintiff will be unjustly enriched if it did not recover the benefits of the claimants' services for which it was required to pay. According to defendant, the plaintiff wrongfully benefits from the rights violations by having its insurance company pay the difference in wages rather than reaching into its own coffers. In the absence of any proof of fraud on the part of plaintiff, an insured could certainly expect that errors in judgment were covered under the subject policy. Unjust enrichment involves the unjust retention of a benefit by one person to the detriment of another. (*Knapp v. McCoy* (N.D. Ill. 1982), 548 F. Supp. 1115, 1118.) However, the court in *Knapp* noted the doctrine of unjust enrichment is used to create an implied contract, citing *Rutledge v. Housing Authority* (1980), 88 Ill. App. 3d 1064, 1069, 411 N.E.2d 82, 85. (See also *Euramca Ecosystems, Inc. v. Roediger Pittsburgh, Inc.* (N.D. Ill. 1984), 581 F. Supp. 415, 422-23.) The courts will not imply a contract where there exists an express contract between the parties on the same subject matter. (*Stone v. City of Arcola* (1989), 181 Ill. App. 3d 513, 528, 536 N.E.2d 1329, 1339.) Since there is an express contract between the parties covering the subject matter, there is no need to resort to implied contracts or unjust enrichment. The question of whether a loss exists is restricted to a consideration on this point of whether the facts fit the policy language. Defendant's cited cases are

distinguishable. Unlike the cases cited by defendant, we find no evidence of unjust enrichment or a double recovery in the case at bar.

Defendant contends plaintiff is not covered for any claim involving violations of constitutional and statutory rights to the extent that such claims are predicated on intentional misconduct. In *New Madrid*, the court explained that the argument of Continental Casualty involved paragraph III(d) of the policy, which stated that a loss does not include matters which are " 'deemed uninsurable under the law pursuant to which this policy shall be construed.' " (*New Madrid*, 904 F.2d at 1241.) Applying Missouri law, the *New Madrid* court held that the insurance policy does not violate Missouri public policy by providing coverage for losses incurred as a result of a civil rights action. (*New Madrid*, 904 F.2d at 1242-43.) The *Convent of Visitation* school case also summarily rejected the claim that this type of loss was uninsurable. (*Convent of Visitation*, 707 F. Supp. at 415.) In *Andover Newton Theological School, Inc. v. Continental Casualty Co.* (1st Cir. 1991), 930 F.2d 89, 93, it was held that Massachusetts public policy did not bar insurance coverage of an employment action for the sole reason that it was founded on a violation of the Age Discrimination in Employment Act of 1967 (see 29 U.S.C. §§621 through 634 (1982)) in a disparate treatment case. A court has also considered and rejected Continental's argument that insuring against discrimination would encourage violations of civil rights as follows:

> "Continental and other insurers which have issued policies containing such clauses have not up to now conceived that they were violating public policy by writing insurance policies insuring against losses resulting from discriminatory employment practices. Neither Congress nor EEOC has interdicted such contracts. Only the issuer of the policy sued on makes such a claim. Exercise of the freedom of contract is not lightly to be interfered with. It is only in clear cases that contracts will be held void as against public policy. *Steele v. Drummond*, 257 U.S. 199, 205, 48 S. Ct. 53, 72 L. Ed. 238; *Greenwood Cemetery, Inc. v. Travelers Indemnity Company*, 238 Ga. 313, 317, 232 S.E.2d 910. This is not one." (*Union Camp Corp. v. Continental Casualty Co.* (S.D. Ga. 1978), 452 F. Supp. 565, 568.)

The *Union Camp Corp.* court explained:

> "The proposition that insurance taken out by an employer to protect against liability under Title VII will encourage violations of the Act is based on an assumption that is speculative and erroneous. Defendant's conclusion is but an *a priori* response to the relation between violations of statutes forbidding

discriminatory practices and the existence of insurance protecting against same." *Union Camp Corp.*, 452 F. Supp. at 567-68.

In the case at bar, defendant attempts to convince this court that there is a public policy in Illinois prohibiting insuring against the consequences of the intentional acts of the insured. Although many liability insurance policies expressly exclude coverage for intentional acts, the subject BEL policy does not. Therefore, the cases cited must be closely scrutinized. In this case, the question is whether there is an overriding public policy in Illinois that insurers cannot contract to indemnify insureds for the consequences of their intentional misconduct.

Before proceeding to a further analysis of this question, it must be pointed out that, under this insurance policy, an insured would expect coverage so as to enable it to defend what it believes to be frivolous or meritless claims, in particular, or those to which it felt it had a good-faith defense. The insured has no control over the allegations made against it. This is an additional reason we find many of defendant's arguments to be without merit, particularly as to defense fees and costs.

■ While defendant has taken great pains to impress this court that the instant case does not involve a duty to defend, the defendant nevertheless cites cases involving the question of a duty to defend. We recognize the duty to defend is independent of and broader than the duty to indemnify and may arise whenever there appears to be a potential for coverage under the policy. (*Solo Cup Co. v. Federal Insurance Co.* (7th Cir. 1980), 619 F.2d 1178, 1185, 1188 n.7.) Of course, the analysis would be applicable if the court in the cited case found there is no duty to defend because there is then no possibility of coverage.

*Solo Cup* involved an umbrella excess liability policy covering unintentional occurrences resulting in personal injury, including discrimination. Initially, the court found that the use of the word "intentionally" in the underlying complaint did not negate coverage or relieve the insurer of a duty to defend. (*Solo Cup*, 619 F.2d at 1184-85.) This conclusion is based on an analysis of the cause of action alleged in the underlying complaint. The underlying action was an employment discrimination case brought pursuant to title VII of the Civil Rights Act of 1964 (see 42 U.S.C. §§2000e through 2000e–17 (1970 & Supp. II 1972)). The court noted there were two theoretical bases for liability under title VII, disparate treatment and disparate impact. Under the disparate treatment theory, discriminatory motive is crucial, but such an element is not present in the disparate impact theory. (*Solo Cup*, 619 F.2d at 1186.) Since the insurer conceded the policy covered some

types of disparate impact cases, under Illinois law the insurance company breached its duty to defend. (*Solo Cup*, 619 F.2d at 1187.) The *Solo Cup* court considered whether insuring such claims violated the public policy against employment discrimination. The court, citing no Illinois cases, stated:

> "This rule is based on the simple principle long ago stated by Judge Cardozo, that 'no one shall be permitted to take advantage of his own wrong.' *Messersmith v. American Fidelity Co.*, 232 N.Y. 161, 133 N.E. 432 (1921). Placing a limitation on the clear meaning of an insurance contract due to policy considerations, is, however, a restraint on the rights of private parties to fashion their own contract, *Union Camp Corp. v. Continental Casualty Co.*, 452 F. Supp. 565, 568 (S.D. Ga.1978), and is a step which courts have taken only where contracts were argued to extend coverage to the knowledgeable and intentional, or the criminal wrongdoer. *Hartford Life Insurance Co. v. Title Guarantee Co.*, 520 F.2d 1170 (D.C. Cir.1975); 1 *Couch on Insurance* 2d §1.36 (1959 & Supp. 1978).
>
> Because we have construed the policy to exclude coverage of disparate treatment liabilities, we do not consider whether the degree of motive which must be proved in that type of action would be equivalent to a knowledgeable and intentional wrong such as would void policy provisions purporting to cover those claims.
>
> With respect to the coverage of disparate impact liabilities, there is clearly no basis for voiding or limiting the contract. An insured may incur liability or become involved in litigation under that theory as a result of its utilization of any of a variety of seemingly neutral selection criteria. We note our agreement with the opinion of the Court of Appeals for the Sixth Circuit in *L'Orange v. Medical Protective Company*, 394 F.2d 57, 60 (6th Cir. 1968), where that court, interpreting Ohio law, observed that 'the violation of public policy is measured by the tendency of the contract to injure the public good rather than by actual injury under the particular circumstances.'
>
> We do not think that allowing an employer to insure itself against losses incurred by reason of disparate impact liabilities will tend in any way to injure the public good, which we equate here with that equality of employment opportunity mandated by Title VII. To the contrary, the fact of insurance may be helpful toward achieving the desirable goal of voluntary compliance with the Act. The statistical proofs in disparate impact actions,

most particularly those involving employment testing, have become increasingly complex and employers now often retain batteries of experts to validate their selection criteria. Such complex analyses of employment standards, while apparently necessary in order to ensure that an employer's policies do not needlessly place a stumbling block in the way of women or minorities, may well become, as a practical matter, beyond the financial capabilities of all but the largest employers. The involvement of insurance in the field might, however, ease the burden on smaller employers by making claim prevention services available on a cost effective basis to help employers evaluate their employment standards. Workmen's compensation insurers have, by way of analogy, no doubt helped prevent numerous employee injuries, and it is not undesirable, nor inconceivable, that discrimination insurers might aid in preventing the injury of discrimination as well." *Solo Cup*, 619 F.2d at 1187-88.

Additional cases relied on by defendant for a statement of Illinois public policy are *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 336 N.E.2d 881, and *Rubenstein Lumber Co. v. Aetna Life & Casualty Co.* (1984), 122 Ill. App. 3d 717, 462 N.E.2d 660. In *Rubenstein Lumber*, after the court held Aetna's workers' compensation insurance policy did not cover the retaliatory discharge claim, the court then added the following *dictum*:

"Moreover, even if the policy was written to expressly require defendant to defend and indemnify plaintiff in the retaliatory discharge action, we believe that such a provision would be void as against public policy, for it would be an attempt to indemnify and insure the company for damages resulting from its voluntary misconduct. An agreement to indemnify or insure against one's voluntary, not accidental, misconduct is against public policy and unenforceable. See *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 500-01, 336 N.E.2d 881, 885." (*Rubenstein Lumber*, 122 Ill. App. 3d at 719, 462 N.E.2d at 662.)

That passage is not necessary to the *Rubenstein Lumber* decision and this court is not bound to follow it. Furthermore, *Rubenstein Lumber* mischaracterizes the *Davis* authority it cites. The passage from *Davis* to which *Rubenstein Lumber* refers is the following: "First, an agreement to indemnify against wilful misconduct would, as a general rule, be contrary to public policy and unenforceable ***." (*Davis*, 61 Ill. 2d at 500-01, 336 N.E.2d at 885.) In addition to acknowledging the potential for exceptions inherent in the general rule, the statement was

made, not in the context of insurance, but rather in reference to an indemnification agreement between employer and employee, which plainly involves very different public policy considerations. Defendant cites no Illinois authority suggesting *Davis* creates an unequivocal policy against affording such coverage. Obviously, public policy places some limits on insurance coverage. In *Checkley v. Illinois Central R.R. Co.* (1913), 257 Ill. 491, 496-97, 100 N.E. 942, 944, it was noted:

> "A fire insurance policy issued to anyone which purported to insure his property against his own willful and intentional burning of the same would manifestly be condemned by all courts as contrary to a sound public policy ***."

However, the public policy considerations precluding insurance coverage for self-inflicted injury are less persuasive when tortious liability to innocent third parties is involved. While intentional tortfeasors should not be allowed to shift liability to the insurer, the insurer is an informed contracting party with no inferiority in bargaining position and should not be allowed to escape from the contract it freely entered into. There is the additional public policy which favors affording compensation to victims. (See *U.S. Fire Insurance Co. v. Beltmann North American Co.* (N.D. Ill. 1988), 695 F. Supp. 941, 947-50, *rev'd* (7th Cir. 1989), 883 F.2d 564.) This court, in *Western Casualty & Surety Co. v. Adams County* (1989), 179 Ill. App. 3d 752, 534 N.E.2d 1066, has already determined that an insurance policy may cover intentional acts of civil rights violations in the absence of a provision specifically excluding intentional acts.

> "Here, we note there is no endorsement in either the general comprehensive policies or the umbrella policies specifically excluding intentional acts, with the exception of the sheriff's endorsement, which excludes coverage for wilful police misconduct. Included within coverage under the personal injury provisions for years three and four are false arrest, false imprisonment, and defamation, all of which require the element of intent. Thus, the policies cover some intentional conduct. This ambiguity is sufficient to refute Western's argument that the policies do not cover intentional acts. (See *Tews Funeral Home, Inc. v. Ohio Casualty Insurance Co.* (7th Cir. 1987), 832 F.2d 1037.) Resolving any doubts against the insurer, we hold the civil rights allegations fall potentially within the scope of policy coverage." (*Western Casualty*, 179 Ill. App. 3d at 759, 534 N.E.2d at 1070.)

The issue of whether there is a general public policy was not raised in that case. Similarly, without discussing any broad policy consideration,

the court in *Community Unit School District No. 5 v. Country Mutual Insurance Co.* (1981), 95 Ill. App. 3d 272, 276-77, 419 N.E.2d 1257, 1260, found coverage for losses resulting from claims or suits arising from alleged sexual or racial discrimination on a school legal liability insurance policy.

■ Based on our analysis of the cases cited, and others, we find there is no Illinois public policy prohibiting insuring for damages caused by one's intentional acts except to the extent that the insured wrongdoer may not be the person who recovers the policy proceeds. The fact that many insurance policies contain an exclusion for intentional conduct demonstrates insurers have not relied on any broad public policy. Defendant could have included such an exclusion in its BEL policy, but did not. This court will not rewrite the BEL policy to create an exclusion.

## V. DISCRIMINATION AGAINST STUDENTS

This argument relates only to the underlying claim of Jones. Jones' *pro se* complaint alleged "intentional and willful" racial discrimination in contravention of title VI of the Civil Rights Act of 1964 (see 42 U.S.C. §§2000d through 2000d—6 (1982)); "intentional" racial conspiracy; violation of due process rights to a fair hearing; fraud based on "intentional" deceit, concealment, conflict of interest, and malice; repeated "intentional" breach of contract; unfairness of medical school examinations based on racial discrimination; violation of rights to freedom of speech; and misappropriation of Federal funds.

Defendant cites no authority and relies entirely on the language of subparagraph (3) of the clarification endorsement. Plaintiff also cites no authority and argues that the clarification endorsement, as a whole, pertains to bussing and class-action type desegregation claims and not civil rights actions by individual students.

■ We agree with plaintiff that the language of subparagraph (3) of the clarification endorsement does not clearly state that losses arising from civil rights actions brought by individual students are not covered. At oral argument, defendant's counsel admitted plaintiff had no input into the drafting of this policy. At best, we find the language of subparagraph (3) of the clarification endorsement ambiguous, and such ambiguity must be resolved against defendant and in favor of coverage. Accordingly, the trial court correctly determined the exclusion does not apply.

## VI. Mental Anguish, Emotional Distress, Humiliation, Injury To Reputation

■ Defendant's next contentions are that paragraph IV(b)(3) of the policy excludes coverage for losses on claims of mental anguish and emotional distress and paragraph IV(b)(4) excludes coverage for losses incurred in defending claims alleging damages of humiliation and injury to reputation. The relevant subparagraphs state:

"(b) The Insurer shall not be liable to make any payment for loss in connection with any claim against the Assureds and/or the School district:

\* \* \*

(3) for any damages, direct or consequential, arising from bodily injury, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use thereof;

(4) for false arrest, libel, slander, defamation of character, invasion of privacy, wrongful eviction, assault or battery, except insofar as may be insured under any other valid policy or policies and then only in excess of such insurance."

Black's Law Dictionary defines "bodily injury" as follows: "*Bodily injury.* Generally refers only to injury to the body, or to sickness or disease contracted by the injured as a result of injury." (Black's Law Dictionary 159 (5th ed. 1979).) Defendant cites the *Convent of Visitation* case to support its argument that mental anguish is excluded by paragraph IV(b)(3). The case does not support that conclusion because the school conceded the issue. (*Convent of Visitation*, 707 F. Supp. at 415.) Plaintiff cites a number of other out-of-State cases supporting its contention that "bodily injury" does not include mental anguish and emotional distress and therefore there is no exclusion.

Of the cases cited by plaintiff, two directly consider the exclusion in the policy, but are of no significant help. A burn is a bodily injury and a claim therefor is excluded from coverage (*Continental Casualty Co. v. McAllen Independent School District* (5th Cir. 1988), 850 F.2d 1044, 1046), and a claim for an injury to a child's hand during a tug-of-war is excluded from coverage even though the child claimed a civil rights violation (*Continental Casualty Co. v. Hall* (Tex. Ct. App. 1988), 761 S.W.2d 54, 56). Both cases, however, note that in determining the applicability of an exclusion, the

courts must focus on the origin of the damages rather than the legal theory asserted.

The remaining cases cited by plaintiff all deal with the duty to defend. In *Farm Bureau Mutual Insurance Co. v. Hoag* (1984), 136 Mich. App. 326, 356 N.W.2d 630, damages were sought on the basis of denial of civil rights for humiliation, public ridicule, loss of reputation, and mental anguish and suffering. Defining "bodily injury" as an actual physical hurt or harm to the human body, the court found no duty to defend. (*Farm Bureau*, 136 Mich. App. at 334-35, 356 N.W.2d at 633.) Relied on in that case was *Rolette County v. Western Casualty & Surety Co.* (D. N. Dak. 1978), 452 F. Supp. 125, wherein the policy covered bodily injury and the plaintiff alleged humiliation, mental anguish, and emotional distress resulting from the seizure of property by the sheriff. Therein it was held there was no duty to defend because nonphysical harm was not covered. (*Rolette*, 452 F. Supp. at 130.) In *Mutual Service Casualty Insurance Co. v. Co-op Supply, Inc.* (D. Mont. 1988), 699 F. Supp. 1438, 1440, 1442-43, allegations of humiliation, pain, mental and emotional distress by a former employee in a wrongful termination action did not trigger a duty to defend under the bodily injury portion of the general liability policy because such coverage was limited to physical injury, sickness or death, although the allegation did trigger a duty to defend under the "personal injury" portion of an umbrella policy. In *West American Insurance Co. v. Bank of Isle of Wight* (E.D. Va. 1987), 673 F. Supp. 760, a claim of emotional distress by an employee who alleged wrongful termination was not "bodily injury" within the policy coverage, relying on *Rolette* and *American & Foreign Insurance Co. v. Church Schools* (E.D. Va. 1986), 645 F. Supp. 628, 632, which stated that "bodily injury" coverage does not cover purely emotional injury.

Illinois courts have considered bodily injury coverage in insurance policies, but in most liability insurance policies, the term is expressly defined to mean " 'bodily injury, sickness or disease.' " (See *Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 33, 514 N.E.2d 150, 154; see also *State Street Bank & Trust Co. v. INA Insurance Co.* (1991), 207 Ill. App. 3d 961, 964, 567 N.E.2d 42, 44 (wherein this court considered a policy which covered personal injury, defined as including bodily injury and mental anguish if it arose out of bodily injury and further defined bodily injury as " 'bodily injury, sickness or disease sustained by any person' ").) However, where the policy defines bodily injury to mean "injury, sickness or disease" the use of the term "injury," without limiting it to actual physical injury, has

allowed the courts of this State to find coverage for loss of consortium claims. (*Club Exchange Corp. v. Richter* (1991), 221 Ill. App. 3d 77, 81-82, 581 N.E.2d 709, 711-12; *General Casualty Co. v. McCowan* (1991), 221 Ill. App. 3d 96, 99-100, 581 N.E.2d 728, 729-30; *Filip v. North River Insurance Co.* (1990), 201 Ill. App. 3d 351, 354-55, 559 N.E.2d 17, 19-20.) In *Filip*, the court stated:

"Finally, North River argues that by 'placing undue emphasis upon the word "injury," plaintiff has distorted the purpose of the Policy and the intent of the parties.' Specifically, North River contends that if 'bodily injury' is construed to include all injuries, then 'sickness, disease and death' would be redundant. In light of the fact that insurance policies consistently define 'bodily injury' as 'bodily injury,' North River's argument as to the impropriety of redundancy in insurance policies is unpersuasive. (*Creamer v. State Farm Mutual Automobile Insurance Co.* (1987), 161 Ill. App. 3d 223, 224, 514 N.E.2d 214 ('bodily injury' defined as 'bodily injury to a person'); *Giardino v. Fierke* (1987), 160 Ill. App. 3d 648, 654, 513 N.E.2d 1168 (' "Bodily Injury" means bodily injury to any person'); *Campbell v. Farmers Insurance Co.* (1987), 155 Ariz. 102, 745 P.2d 160 ('Bodily injury' is defined as 'bodily injury'); *Albin v. State Farm Mutual Automobile Insurance Co.* (La. 1986), 498 So. 2d 171 ('Bodily Injury—means bodily injury to a person'); *Allstate Insurance Co. v. Handegard* (1984), 70 Or. App. 262, 688 P.2d 1387 ('Bodily injury' is defined as 'Bodily injury').) As these cases indicate, in order to limit its liability in the present case, North River should have defined 'bodily injury' by its own term rather than by a term which broadened its ordinary meaning."

*Filip*, 201 Ill. App. 3d at 355, 559 N.E.2d at 20.

In the case at bar, "bodily injury" is not separately defined in the policy as including any injury to a person. Therefore, we construe its meaning to be restricted to "actual physical injury" as opposed to broadening it to include mental anguish and mental distress. The trial court correctly ruled that exclusion IV(b)(3) does not avoid coverage as to the underlying claims involved in this appeal.

■ As for the exclusion in IV(b)(4), the terms "libel," "slander," and "defamation" are terms of art referring to the broadcasting of false representations about a person. Without considering whether humiliation and loss of reputation are even compensable elements of damages in Illinois, it is clear that a person could feel humiliated or a loss of reputation for the truth or when no representation is broadcast at all. A prime example could be Segre who, because she was not

promoted, might feel humiliated and that her reputation is diminished by the withholding of the promotion, even though no one ever said she was not qualified. Arguably, the lack of qualification might be implied in the refusal to promote, but it could also be that she was humiliated by the disparate treatment. As for loss of reputation, unless there is a broadcasting of the information, there can in fact be no loss of reputation (as opposed to one feeling a loss of reputation), but again, the information broadcast may be simply the truth that someone else was promoted. Therefore, the court must look to the underlying event which allegedly caused the damage, and if it is not the broadcasting of a false representation about the claimant, but is some other event, such as retaliatory discharge or a title VII violation, perhaps caused by disparate impact rather than disparate treatment, coverage will be found. Since the underlying actions were not actions for libel, slander, or defamation, the exclusion does not apply.

## VII. LATE NOTICE

Finally, defendant contends some of the claims are excluded by the fact that plaintiff provided late notice in violation of the policy. This argument applies to the claims arising out of the Jones and Segre actions.

The plaintiff's complaint alleged Segre filed her EEOC complaint for sex discrimination on May 17, 1980. On July 2, 1982, she filed a complaint in Federal court and notice to defendant was provided by letter dated July 30, 1982. Jones filed a charge against the University with the Office of Civil Rights of the United States Department of Education on April 30, 1979. He filed suit on December 21, 1983. Plaintiff notified defendant of the suit on January 25, 1984. The insurance policies provided:

> "The School District, or the Assureds shall, as a condition precedent to their rights under the policy, give the Insurer notice in writing of any claim * * *."

Generally, the timeliness of the notice given pursuant to a policy provision is a question of fact for the trier of fact, although it may be decided by the court if no genuine issue of material fact exists. *International Harvester Co. v. Continental Casualty Co.* (1962), 33 Ill. App. 2d 467, 475, 179 N.E.2d 833, 836-37.

> "The purpose of a notice requirement such as the one found in the INA policy is to enable the insurer to make a timely and thorough investigation of the injury claim. (*Barrington Consolidated High School v. American Insurance* (1974), 58 Ill. 2d 278, 319 N.E.2d 25; *McFadyen v. North River Insurance Co.* (1965),

62 Ill. App. 2d 164, 209 N.E.2d 833.) Such provisions are not considered technical requirements, but rather are valid prerequisites to coverage. (*International Harvester Co. v. Continental Casualty Co.* (1962), 33 Ill. App. 2d 467, 179 N.E.2d 833.) Therefore, when the insured fails to comply with a prompt notice requirement, the insurer may deny liability, regardless of whether it has been prejudiced by the delay. *City of Chicago v. United States Fire Insurance Co.* (1970), 124 Ill. App. 2d 340, 260 N.E.2d 276." *INA Insurance Co. v. City of Chicago* (1978), 62 Ill. App. 3d 80, 83, 379 N.E.2d 34, 36-37.

The insured need not provide notice of every possible event out of which coverage may arise, but only of claims made. (See *Barrington Consolidated High School v. American Insurance Co.* (1974), 58 Ill. 2d 278, 282-83, 319 N.E.2d 25, 27-28.) Generally, the purpose of the notice provision is to allow the insurer to make a prompt and thorough investigation to determine the question of and extent of liability. (*McLaughlin v. Attorneys' Title Guaranty Fund, Inc.* (1978), 61 Ill. App. 3d 911, 917, 378 N.E.2d 355, 359-60.) Prejudice to the insurer may be a factor to be considered in determining whether reasonable notice has been given, but it does not dispense with the requirement of giving notice. *Simmon v. Iowa Mutual Casualty Co.* (1954), 3 Ill. 2d 318, 322, 121 N.E.2d 509, 511; see also Annot., *Modern Status of Rules Requiring Liability Insurer to Show Prejudice to Escape Liability Because of Insured's Failure or Delay in Giving Notice of Accident or Claim, or in Forwarding Suit Papers*, 32 A.L.R.4th 141, 156 (1984).

"There is an important difference between a notice clause and a cooperation clause. '[I]n Illinois, an insurer does not have to prove it was prejudiced by an insured's breach of the notice clause in a policy in order to escape its duty to pay.' *M.F.A. Mutual Insurance Co. v. Cheek* (1975), 34 Ill. App. 3d 209, 218, 340 N.E.2d 331.

Where there has been late notice to an insurer the issue is not whether the insurer has been prejudiced, but, rather whether reasonable notice has been given. 'No general rule can be promulgated as to what constitutes a reasonable time within which to give notice since this question depends upon the facts and circumstances of each particular case. One of the factors to be considered include the length of time in giving the notice, *i.e.*, was the delay unreasonable, and was the insurer prejudiced by reason of the delay.' *American Home Assurance Co. v.*

*City of Granite City* (1978), 59 Ill. App. 3d 656, 659, 375 N.E.2d 969.

The notice requirement is not a technical requirement merely for the convenience of the insurer, but rather, it is a valid prerequisite for coverage. (*Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services, Inc.* (1985), 138 Ill. App. 3d 574, 581, 485 N.E.2d 1281.) While absence of prejudice to the insurer may be a factor in determining whether notice was reasonable, the absence of prejudice does not dispense with the notice requirement. *Equity General Insurance Co. v. Patis* (1983), 119 Ill. App. 3d 232, 236, 456 N.E.2d 348." (*Illinois Insurance Guaranty Fund v. Lockhart* (1987), 152 Ill. App. 3d 603, 608, 504 N.E.2d 857, 860-61.)

Where the giving of notice is a condition precedent to a right of action against the insurance company, the prejudice resulting from the delay in giving notice is deemed immaterial. (*Equity General Insurance Co. v. Patis* (1983), 119 Ill. App. 3d 232, 236, 456 N.E.2d 348, 351.) However, where the insurer has actual knowledge of the claim from another source, courts have allowed the insured to rely on that fact in determining the reasonableness of the notice given. (See *McLaughlin*, 61 Ill. App. 3d at 917, 378 N.E.2d at 360, cited and distinguished in *Illinois Valley Minerals Corp. v. Royal-Globe Insurance Co.* (1979), 70 Ill. App. 3d 296, 301-03, 388 N.E.2d 253, 257-58.) There is no evidence in this case that defendant had actual knowledge of the claims prior to receiving notice from plaintiff.

 In the case at bar, plaintiff argues defendant was not prejudiced and the notice was therefore timely for two reasons: (1) the administrative actions did not give rise to a claim under the policy, and (2) defendant had no duty to defend so it is not prejudiced by the lack of opportunity to investigate. With regard to the first of plaintiff's arguments, we are referred by defendant to count X of plaintiff's complaint, which involved the claim of Clarice E. Mills for sex discrimination filed before the Illinois Human Rights Commission, and regarding which there is no dispute as to late notice. Plaintiff contends it is entitled to receive reimbursement for settlement and defense fees incurred for the Mills administrative claim. Defendant points out that this is inconsistent with plaintiff's position with regard to the Jones and Segre claims. The University's first argument is curious to say the least. In the Mills claim there is no question of timely notice. The Mills claim was settled by the University and summary judgment was granted against defendant insurer in the amount of $11,984.80 ($8,041.04 settlement and $8,943.76 defense fees and expenses, minus

the $5,000 deductible). Plaintiff argues the Mills claim is different because it involved outside counsel and the possibility of a money judgment. In Segre, however, the EEOC claim was settled for $5,000 at the same time the lawsuit was settled for $130,000. Apparently in-house and outside counsel were involved in the Segre claims. As defendant points out, whether the civil litigation in Jones and Segre involved separate claims or a continuation of the claims initiated in the administrative proceedings is a question of fact important in the determination of whether timely notice was given. We agree with defendant that the plaintiff's position is inconsistent.

With regard to whether it was prejudiced, defendant makes the additional relevant point that, while it did not have the duty to defend, it was deprived of an opportunity to monitor or participate in the administrative claims early on so as to reduce or eliminate possible exposure. When an administrative claim is filed, there is an obvious potential that it may blossom into a lawsuit. Moreover, by getting defendant involved, an education process for plaintiff's employees may be instituted earlier to enable plaintiff to avoid or reduce future claims.

Since reasonable persons could draw different inferences from the uncontroverted facts, as to counts III and XIII, the summary judgment is reversed. On remand, the factual questions to be resolved are whether notice was given, as that term is defined in the policy, and if so, whether the notice was reasonable.

Defendant also asks this court to consider whether summary judgment was improper because it is entitled to allocate costs of defense between covered and noncovered claims as a matter of law, or whether a genuine issue of material fact exists with regard to that question. In light of our determination that none of the exclusions apply, there is no need at this time to address the question of allocation between covered and noncovered losses.

## VIII. "OTHER INSURANCE" EXCLUSION

Regarding count VIII, the Phares claim, defendant argues the "other insurance" exclusion applies. Defendant's entire "other insurance" argument encompasses one paragraph of its brief without citation of authority. Plaintiff points out that, although one defendant in the underlying lawsuit notified his professional liability insurance carrier, this fact did not raise the inference that the professional liability carrier, Fireman's Fund, had a duty to defend that individual. Plaintiff also points out that Fireman's Fund did not contribute to the de-

fense costs. Defendant has the burden of proving that the exclusion applies, and has not met it as to the "other insurance" exclusion.

## IX. REASONABLENESS OF FEES

■ In count XIII, the Jones claim, defendant also argues that there is a genuine issue of material fact concerning the reasonableness of fees and costs in defense of the Jones claim, there being a possibility of double charges because much of the research was relevant also to the defense of the Craft and DeSalle claims. Plaintiff counters by stating that defendant has not offered any evidence that fees incurred to defend the Jones claim were unreasonable. Defendant does not respond to that argument. The defendant relied on the fact the University's counsel used legal and factual research conducted in the Craft and DeSalle matter. That certainly does not prove that the fees were not reasonable considering the length of the Jones proceeding was four years. Attorneys often start work on a case with knowledge acquired through prior handling of other cases. Without proof the attorneys charged twice for the same work, there is no factual basis for the argument defendant now asserts. No genuine issue of material fact remains on this point.

## X. CONCLUSION

Accordingly, the summary judgment of the circuit court of Champaign County is affirmed as to counts I, V, VIII, IX, and X. As to counts III and XIII, summary judgment is reversed. For the reasons heretofore stated, the cause is remanded to resolve the factual questions of whether notice was given, as that term is defined in the policy, and, if so, whether the notice was reasonable.

Affirmed in part, reversed in part, and remanded with directions.

STEIGMANN and COOK, JJ., concur.