In the Matter of The CELOTEX CORPORATION, et al., Debtors.

The CELOTEX CORPORATION, et al., Plaintiff,

v.

AIU INSURANCE COMPANY, et al., Defendants.

Bankruptcy Nos. 90–10016–8B1, 90–10017–8B1. Adversary No. 91–40.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Dec. 22, 1997.

See also 196 B.R. 611, 196 B.R. 973.

Jeffrey W. Warren, Bush, Ross, Gardner, Warren & Rudy, P.A., Tampa, FL, for Celotex Corp. and Carey Canada.

Charles P. Schropp, William R. Daniel, Schropp, Buell & Elligett, P.A., Tampa, FL, Deborah A. Swindells, Karen L. Bush, Nicholas J. Zoogman, Anderson, Kill, Olick & Oshinsky, Washington, DC, Stephen A. Madva, Montgomery McCracken Walker & Rhoads, Philadelphia, PA, Bruce Bishop, Willcox & Savage, Norfolk, VA, for Plaintiffs.

Sara Kistler, Assistant United States Trustee, Tampa, FL.

John W. Kozyak, Kozyak Tropin Throckmorton & Humphreys, P.A., Miami, FL, for Asbestos Property Damage Claimants Committee.

Charles M. Tatelbaum, Johnson, Blakely, Pope, Boker, Ruppel & Burns, P.A., Clearwater, FL, for Unsecured Trade Creditors Committee.

William Knight Zewadski, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, FL, for Unofficial Asbestos Health Claim Co–Defendants Committee.

H.C. Goplerud, Honigman Miller Schwartz and Cohn, Tampa, FL, Sheldon S. Toll, Honigman Miller Schwartz & Cohn, Detroit, MI, for Asbestos Health Claimants Committee.

Daniel C. Sauls, John Flyger, Steptoe & Johnson Company, Washington, DC, for Highlands Insurance Co.; Old Republic Insurance Company.

Robert J. Bates, Jr., Maryann C. Hayes, Stanley V. Figura, Bates Meckler Bugler & Tilson, Chicago, IL, for Eric Reinsurance Company.

Deborah M. Paris, Paris & Associates, Tampa, FL, for Certain Underwriters at Lloyd's of London (Plaisted).

John A. Yanchunis, Blasingame Forizs & Smiljanich, St. Petersburg, FL, for Transportation Insurance Company, Continental Casualty Company, Columbia Casualty Company, Eric Reinsurance Company and Zurich American Insurance Company.

David C. McLauchlan, Andrew Kochanowksi, Lord Bissell & Brook, Chicago, IL, for Certain Underwriters at Lloyds of London.

Thomas B. Keegan, Robins, Kaplan, Miller & Ciresi, Chicago, IL, for Employers Mutual Casualty Company.

William Clearly, Mendes & Mount, New York City, for Barrett and London Market Companies.

Gregory J. Willis, Bart Billbrough, Walton Lantaff Schroeder & Carson, Miami, FL, for Florida Insurance Guaranty Association, Inc.

W. Gray Dunlap, Jr., Tampa, FL, for Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company.

Rolph Gilbertson, Zeele & Larson, Minneapolis, MN, for Employers Insurance of WAUSAU.

Margaret Jones, Grippo & Eldon, Chicago, IL, for American Insurance Company and National Surety Corporation.

Thomas B. Mimms, Jr., MacFarlane Ferguson, Tampa, FL, for American Home As-

surance Company, AIU Insurance Company, Highlands Insurance Company, Old Republic Insurance Company, Granite State Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, Employers Mutual Casualty Company, American Insurance Company, National Surety Company, St. Paul Surplus Lines Insurance Company.

Christine A. Nykiel, Jackson & Cambell, Washington, DC, for American Home Assurance Company, AIU Insurance Company, Granite State Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA.

Elizabeth G. Repaal, Harris Barrett, Mann & Dew, Tampa, FL, for Northbrook, as successor in interest to Allstate Insurance Company.

Mary A. Lau, Esquire, Lau Lane·Pieper Conley & McCreadie P.A., Tampa, FL, for Employers Insurance Company of WAUSAU.

Elizabeth B. Sandza, Cynthia T. Andreason, Leboeuf Lamb Greene & Macrea, Washington, DC, for Hudson Insurance Company and Gibraltar Casualty Company.

William S. Daskam, IV, Butler Burnette & Pappas, Tampa, FL, for Continental Insurance Company.

Rick Dalan, Clearwater, FL, for Royal Indemnity Company.

Jeffrey A. Aman, Aman & Lins, Tampa, FL, for Insurance Company of North America and California Union Insurance Company.

## ORDER ON DEFENDANTS' RULE 52(C) MOTIONS FOR JUDGMENT REGARDING BODILY INJURY AND PROPERTY DAMAGE LATE NOTICE

THOMAS E. BAYNES, Jr., Bankruptcy Judge.

This matter came on for consideration upon Motions for Judgement under Rule 52(c) of the Federal Rules of Civil Procedure filed by asbestosis bodily injury Defendants, Eric Reinsurance Co. and Plaisted London Market, and property damage Defendants, Hartford Accident and Indemnity Co., First State Insurance Co., Twin City Fire Insurance Co., Century Indemnity Co., as successor to Insurance Co. of North America and Cigna Specialty Co., Federal Insurance Co., Plaisted London Market, and Protective National Ins. Co. of Omaha and National Surety Corp., Florida Insurance Guaranty Association, Inc. (relative to policies issued by Midland Insurance Co., Integrity Insurance Co. and Transit Casualty Co.). The movants are collectively referred to herein as Defendants.[1] This decision is applicable to both the asbestos bodily injury and property damage portions of the notice phase (Phase IV) of this adversary proceeding.[2]

## I. INTRODUCTION

The question before the Court is whether the Celotex Corporation's and Carey Canada Inc.'s (collectively Debtor) notice, if any, of asbestos bodily injury and property damage claims to Defendants, i.e., excess insurers, was proper and timely under the applicable insurance policy provisions.[3] Defendants contend Debtor failed to meet its burden of proving proper and timely notice and seek

---

1. To the extent there are movants not specifically identified herein, this ruling pertains to all Defendants in Adversary Proceeding 90–41 who have not settled with Debtor. Further, this ruling does not affect in any manner any settlements between the Debtor and any Defendant insurers.

2. This adversary proceeding was severed into four phases, Phase I pertained to property damage coverage. *The Celotex Corp. et al. v. AIU Insurance Co. et al.,* 196 B.R. 973 (Bankr. M.D.Fla.1996)(Phase I opinion). Phase II concerns bodily injury coverage; Phase III concerns coverage for environmental claims and was mediated to settlement; and Phase IV governed notice.

3. Much of this issue, as it related to bodily injury notice, was considered earlier through Motions for Summary Judgment on Timeliness of Notice of Bodily Injury Claims Filed by Eric Reinsurance and Plaisted London Market. *The Celotex Corporation, et al. v. AIU Insurance Company, et al.,* 196 B.R. 611 (Bankr.M.D.Fla.1996)(the "Eric" opinion). Nothing herein seeks to detract from that opinion.

judgment as a matter of law pursuant to Rule 52(c). To the contrary, Debtor contends it satisfied the notice provisions of the excess policies which required notice only be given when it appeared reasonably likely losses would reach a level which would impact the excess insurance policies' coverage.

Under that theory, then, the Debtor seeks coverage for asbestos-related bodily injury and property damage claims under excess liability policies issued to Debtor, or predecessors of the Debtor, for policy periods between October 1, 1978, and October 1, 1984 (post-October 1978–1984). During these relevant periods, Aetna was the Debtor's primary insurer under general comprehensive liability insurance policies. The Defendants' policies covered various amounts of liability in excess of the primary policies and generally followed form to the underlying umbrella or primary policies.[4]

Prior to 1977, the Debtor's insurance included coverage from several insurance companies for asbestos-related bodily injuries. Aetna was Debtor's primary carrier and various other insurance companies issued umbrella and excess layer policies.[5] Subsequent to 1977, the Aetna primary policy provided no asbestos-related bodily injury coverage and the excess policies excluded coverage for "asbestosis."[6] During the post-October 1978–1984 period, the Debtor or its predecessors[7] purchased umbrella or excess comprehensive general liability insurance coverage mainly through the efforts of Debtor's in-house insurance department and independent brokers; primarily Rollins Burdick & Hunter

(RBH) and, in London, through such brokers as C.E. Heath and Company.

The Defendants issued excess comprehensive general liability insurance to the Debtor for policy periods subsequent to October 1978 which contained one of two asbestosis exclusions. The introduction of the exclusions into the policies is an important consideration, not only for the purpose of whether certain claims were excluded[8] but, unquestionably, for their aggregate impact on the timing of Debtor's notice to Defendants of the bodily injury claims, since these excess policies also provided coverage for property damage; i.e., physical injury to tangible property (Phase I).

## II. RULE 52(c)

Defendants' motions for partial judgment or judgment are based upon Federal Rule of Civil Procedure 52(c). While somewhat new to the Rules, its operation is rather simple and the wording straightforward:

> If, during a trial without a jury, [this adversary proceeding] a party [here, the Debtor] has been fully heard with respect to an issue, [i.e., notice], the court finds against the party on the issue, the court may enter judgment as a matter of law against that party on any claim .... that cannot under the controlling law [Illinois] be maintained or defeated without a favorable finding on the issue.

The 11th Circuit was quick to seize on the operation of Rule 52(c) in *Caro–Galvan v. Curtis Richardson, Inc.,*[9] deciding the trial court, when determining previously tried issues under Rule 52(c), does not have to con-

---

**4.** Although the notice provisions contained in the policies are not identical, they are substantially similar and will be discussed as if they are the same. For a more complete explanation of the primary and excess policies, see *Celotex, supra,* Note 2 at 997–99 (Phase I opinion).

**5.** See the Phase I opinion for a description of primary, umbrella and excess carriers. *Celotex, supra,* Note 1.

**6.** *See Celotex Corp., et al. v. AIU Ins. Co., et al.,* 175 B.R. 98, 102–104 (Bankr.M.D.Fla.1994). Debtor took the position in this litigation the "asbestosis" exclusion only applied to that single disease.

**7.** For a corporate history of the Debtor, see the Phase I opinion, *Celotex, supra,* Note 2 at 977.

**8.** *See supra,* Note 6. Additional issues relating to the "asbestosis" exclusion were tried in Phase II of this adversary and are currently under advisement, pending post-trial motions related to newly found evidence.

**9.** 993 F.2d 1500 (11th Cir.1993)(acknowledging Rule 52(c) as the successor to the former Rule 41(b) which permitted a party to file a motion for nonsuit). Other courts have concurred; *e.g., Gonzales v. United States Department of the Interior,* 1995 WL 94636 (10th Cir.(N.M.))(unpublished decision); *In re Sikes,* 184 B.R. 742 (Bankr.M.D.Tenn.1995).

sider the evidence in a light most favorable to the plaintiff. Rather, under the Rule, the trial court makes findings of fact and conclusions of law based on weighing all the evidence and determining if the plaintiff's prima facie case has been proven.[10]

It appears other courts have viewed the Rule similarly and, in fact, most of the cases contain scant, if any, comment upon the Rule's operation, deeming it self-explanatory.[11] Likewise, Professors Moore and Miller have commented upon Rule 52(c) with little debate, concluding it is basically a tool provided a trial court to render a decision as a matter of law after consideration of all the evidence.[12]

### III. ILLINOIS LAW CONTROLS

▮ The choice of law is Illinois [13] which establishes the legal standard for proving notice of occurrence or claim. Its premise is predicated on the Debtor's duty to notify the excess carrier of an occurrence or an accident as relates to an asbestos bodily injury or damage to property. The Illinois courts take the position such notice is required by the policy, and is not a technicality but a prerequisite to coverage, i.e., a condition precedent to the insured's policy coverage. The cases of *University of Illinois v. Continental Casualty Co.*, 234 Ill.App.3d 340, 175 Ill.Dec.

324, 599 N.E.2d 1338 (1992), *American States Insurance Co. v. National Cycle, Inc.*, 260 Ill.App.3d 299, 197 Ill.Dec. 833, 631 N.E.2d 1292 (1994), and *Transamerica Insurance Co. v. Interstate Pollution Control, Inc.*, 1995 WL 360460 (N.D.Ill.) are illustrative of this issue; however, there are numerous other decisions of the same ilk. Most of those decisions concern the requirement that notice be given as soon as practicable, which the Illinois courts have discerned to mean reasonable notice.[14]

▮ The Debtor bears the burden here, under Illinois law, of establishing notice was not required or was reasonably given.[15] The above cases address the issue of when the Debtor, as a reasonably prudent insured, had cause to believe that a particular occurrence required notice to its primary insurance carrier. The reasonableness of notice varies based on different duties, mainly the duty to defend and the duty to investigate the occurrence, which are placed upon the primary carrier, as distinct from the umbrella and excess carriers. The excess carriers normally do not expect they will receive notice for an occurrence associated with an insured unless the excess coverage will, in fact, be impacted by such occurrence (i.e., the insured's liability will transverse the primary

---

10. This Court has previously ruled any evidence admitted in any phase is deemed admitted in all phases of the adversary. Therefore, in addition to the evidence admitted in Phase IV, the Court's decision is also based upon many facts associated with notice and insurance coverage admitted throughout this adversary proceeding.

11. *E.g., Dictiomatic, Inc. v. United States Fidelity & Guaranty Company*, 958 F.Supp. 594 (S.D.Fla. 1997); *Sovereign Partners v.. Lascu*, 1997 WL 160279 (9th Cir.(Nev.)); *Brenton Production Enterprises, Inc. v. Motion Media*, 1997 WL 603412 (6th Cir.(Tenn.)); *Gnadt v. Castro*, 1996 WL 106737 (4th Cir.(Va.)); *Gonzales v. United States Department of the Interior*, 1995 WL 94636 (10th Cir.(N.M.)); *Moore v. Crescent Jewelers*, 1997 WL 383297 (N.D.Ca.1997); *Anand v. National Republic Bank of Chicago*, 1996 WL 596399 (N.D.Ill.).

12. *See generally* **Moore's Federal Practice,** Chapter 52 *Findings by the Court; Judgment on Partial Findings*, (Third ed. 1997); Charles Alan Wright & Arthur R. Miller, **Federal Practice and Procedure,** *Civil 2d § 2573.1, Judgment on Partial Findings; see also Judgment on Partial Findings*

*Involves Different Standard than Judgment as a Matter of Law*, 8 No. 10 **Fed. Litigator** 294 (Jan. 1994).

13. *The Celotex Corp. et al. v. AIU Insurance Co. et al.*, 194 B.R. 668 (Bankr.M.D.Fla.1996). As of this opinion, the Illinois law of notice has not been modified.

14. *E.g. Barrington Consolidated High School v. The American Insurance Co.*, 58 Ill.2d 278, 319 N.E.2d 25 (1974); *American Country Insurance Co. v. Bruhn*, 289 Ill.App.3d 241, 224 Ill.Dec. 805, 682 N.E.2d 366 (1997), *appeal denied*, 174 Ill.2d 553, 227 Ill.Dec. 1, 686 N.E.2d 1157 (1997); *General Casualty Co. of Ill. v. Juhl*, 283 Ill.App.3d 376, 218 Ill.Dec. 685, 669 N.E.2d 1211 (1996).

15. *E.g., Caterpillar, Inc. v. Great American Insurance Co.*, 62 F.3d 955 (7th Cir.1995); *Illinois Insurance Guarantee Fund v. Lockhart*, 152 Ill. App.3d 603, 105 Ill.Dec. 572, 504 N.E.2d 857 (1987); *Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services, Inc.*, 138 Ill.App.3d 574, 93 Ill.Dec. 71, 485 N.E.2d 1281 (1985).

and umbrella coverage and invade the excess insurance coverage layers). *Atlanta International Ins. Co. v. Checker Taxi Co.*, 214 Ill.App.3d 440, 158 Ill.Dec. 228, 574 N.E.2d 22 (1991).

As a result of this layering of coverage, when an occurrence takes place, the insured has the ability to ascertain how its coverage layers may be affected by the occurrence. With this knowledge, the insured, then, has some discretion in determining when and if the excess coverage will be implicated and thus, whether notice is required. The test as to an excess carrier relates more to the question of when the reasonably prudent insured has cause to believe the excess insurance coverage will be implicated by the occurrence. *See American States Insurance Co. v. National Cycle, Inc.*, 260 Ill.App.3d 299, 197 Ill.Dec. 833, 631 N.E.2d 1292 (1994); *Hartford Accident & Indemnity Co. v. Rush Presbyterian–St. Luke's Medical Center*, 231 Ill.App.3d 143, 172 Ill.Dec. 641, 595 N.E.2d 1311 (1992)[16]; *Atlanta International Insurance Co. v. Checker Taxi Co., Inc.*, 214 Ill. App.3d 440, 158 Ill.Dec. 228, 574 N.E.2d 22 (1991). *See also, Highlands Insurance Co. v. Lewis Rail Service Co.*, 10 F.3d 1247 (7th Cir.1993); *Atlanta International Insurance Co. v. Yellow Cab Co., Inc.*, 962 F.2d 657 (7th Cir.); *reh'g den. with op.*, 972 F.2d 751 (7th Cir.1992).

The Illinois courts have set forth certain indicators to be observed when the trial court considers the facts and measures the reasonableness of the notice. One of the foremost indicators is the sophistication of the insured. *Highlands Insurance Co. v. Lewis Rail Service Co.*, 10 F.3d 1247 (7th Cir.1993); *International Harvester Co. v. Continental Casualty Co.*, 33 Ill.App.2d 467, 179 N.E.2d 833 (1962). Most definitely the Debtor, during the appropriate time period,

was the most sophisticated in the history of Illinois insurance law. Next, timing of the notice in relationship to the status of the ongoing claims or the ongoing litigation, is another implicit indicator. *Atlanta International Insurance Co. v. Yellow Cab Co., Inc., supra.* The length of time between the insured's knowledge of the occurrence and the notice is also often recognized, i.e., whether notice has taken three months, eight months or thirty-two months, although this indicator alone is not conclusive. Due diligence of the Debtor in handling the claims or knowledge of how those claims may impact rights under the policies is also considered part of the timing contingency. *Twin City Fire Insurance Co. v. Old World Trading Co.*, 266 Ill.App.3d 1, 203 Ill.Dec. 264, 639 N.E.2d 584 (1994); *Hartford Accident & Indemnity v. Rush Presbyterian–St. Luke's Medical Center, supra; Transamerica Insurance Co., supra.* Timing in this matter has become the focal point of the determination on reasonableness of notice. Further, reason for any delay in giving notice and the presence of other insurance coverage for similar occurrences are other indicators.

The facts adduced at trial, when applied to the above indicators, should allow this Court, using Illinois law, to determine (1) when a reasonably prudent insured should have had cause to believe the excess insurance coverage would be impacted by an occurrence; and (2) at what point the Debtor's duty to provide notice arose.

## IV. FACTS AND CHRONOLOGY OF EVENTS

The facts surrounding this case are complicated only by virtue of their number and specificity as they relate to certain policy periods, or certain defendants individually,

16. While some of these cases distinguish *Hartford v. Rush,* the analysis turns, to a certain degree, upon the status of the particular litigation of the case juxtaposed against the notice requirement and, ultimately, the question of prejudice. *E.g., American Country Insurance v. Cash,* 171 Ill.App.3d 9, 120 Ill.Dec. 834, 524 N.E.2d 1016 (1988); *Illinois Insurance Guarantee Fund v. Lockhart,* 152 Ill.App.3d 603, 105 Ill.Dec. 572, 504 N.E.2d 857 (1987); *but see Transamerica Insurance Co. v. Interstate Pollution Control, Inc.,* 1995 WL 360460 (N.D.Ill.); *Highlands Insurance Co. v. Lewis Rail Service Co.,* 10 F.3d 1247 (7th Cir.1993). Notwithstanding, while absence of actual prejudice to an insurer is a consideration, it does not conclusively establish whether notice was timely given. *E.g., Millers Mutual Insurance Association of Illinois v. Graham Oil Co.,* 282 Ill.App.3d 129, 218 Ill.Dec. 60, 668 N.E.2d 223 (1996); *American Family Mutual Insurance Co. v. Blackburn,* 208 Ill.App.3d 281, 153 Ill.Dec. 39, 566 N.E.2d 889 (1991).

rather than as a group.[17] There is, however, a discernible route through these comprehensive factual alps leading directly to whether the Debtor gave reasonable notice. This passage is best traversed by observing certain benchmarks in the long history of the Debtor's insurance coverage disputes. Those more general pieces of evidence are discussed below in a somewhat chronological order and are denominated into two categories: intangible and tangible benchmarks.

### A. Intangible Benchmarks

Intangible benchmarks are the practices or processes of the Debtor in obtaining and continuing its insurance coverage and its claim handling procedures during the relevant times. Such facts cannot be considered in a vacuum; rather, they dovetail with the tangible benchmarks to illustrate the Debtor's notice-related efforts concerning asbestos claims. Beginning October 1, 1977, the Debtor was unable to procure insurance coverage which did not exclude coverage for asbestosis or related diseases arising out of asbestos products. The Debtor's own statements contained in its corporate annual reports to shareholders for fiscal years ending August 31, 1980, through 1982;[18] Forms 10–K filed with the Securities and Exchange Commission for the fiscal year ending August 31, 1980;[19] various memoranda and inter-company correspondence discussing insurance renewal issues;[20] litigation documents;[21] and correspondence to one of its umbrella carriers seeking a reduction in premium based on the exclusion for claims, are associated with the "asbestos exposure" exclusion.[22]

In 1977, and each year thereafter, in accordance with Debtor's instructions, RBH began assembling annual underwriting presentations for prospective insurers. These submissions contained information used by the insurers to evaluate renewal policy terms and premiums associated with those policies. Importantly, the submissions for new policies or renewals contained information concerning prior claims data or loss information.

The evidence reveals the Debtor did not include, in the loss runs provided to potential insurers, loss information for any asbestos-related diseases. Moreover, the post-October 1978 insurance application submissions and the testimony of witnesses demonstrate the Debtor did not have procedures in place to organize or categorize asbestos bodily injury claims according to disease, i.e., asbestosis versus lung cancer or mesothelioma. Several insurance application submissions were admitted into evidence acknowledging exclusion language for coverage for "asbestosis." Further, the loss information submit-

17. Testimony alone comprises hundreds of thousands of pages; the record also consists of tens of thousands of exhibits, and bales of motions, memoranda and depositions. The Court is loath to estimate the mountains of evidence shared in discovery but not sought to be introduced during the many months of trial.

18. JD Ex. 5754 at 3, 31.

19. JD Ex. 5762 at 12.

20. E.g., September 30, 1977, memorandum from Charles Harvey, President of Best Insurors ·and Director of Insurance for Jim Walter Corporation (JWC), to James W. Kynes, JWC's general counsel and the former Florida Attorney General, Charles Wilson, the individual overall in charge of litigation for JWC and other JWC management that excess coverage was only available excluding "asbestos" claims, and Northbrook would extend its expiring umbrella policy only subject to a $500,000 deductible for "asbestos" claims; October 4, 1977, memorandum from Harvey to Kynes, Wilson and other JWC management that JWC had not been successful in negotiating a renewal covering asbestos in excess policies; October 13, 1977, memorandum, Harvey advised JWC management the RBH had not "found any responsible carrier to cover asbestos claim" and JWC should consider itself "self insured." December 4, 1980, memorandum from Harvey stating "We have been forced to self-insure our asbestos products liability since October 1, 1977". (JD Ex. 5739).

21. *The Celotex Corp. v. The Aetna Casualty & Surety Co. et. al.*, No. 79–5885 (Hillsborough Cty, Fla.) JD Ex. 4027. In an answer to an interrogatory propounded by a defendant, Debtor responded: "The facts supporting this allegation are the negotiations with the insurance carriers of Celotex during recent years. These negotiations have revealed that these primary and excess insurers are no longer willing to issue comprehensive general liability insurance policies covering asbestos-related losses for a reasonable premium...." JD Ex. 4025.

22. JD Ex. 4052.

ted to the carriers with the insurance applications did not include any claims resulting from inhalation of asbestos fibers, including lung cancer or mesothelioma. One example of such omission is the Debtor's underwriting presentation for its October 1, 1982, policy renewal. Therein, the Debtor did not disclose several non-asbestosis claims (i.e. lung cancer or mesothelioma) despite knowledge of their existence.[23]

Based on the Debtor's underwriting presentations to prospective insurers, the Debtor obtained policies from the Defendants for the various years at issue. These policies contained an exclusion for bodily injuries resulting from "asbestosis" or "related diseases arising out of asbestos products."[24] Coinciding with the Debtor's inability to obtain such coverage, claims against the Debtor for asbestos-related bodily injuries were on the rise. Those claims continued to increase substantially throughout the relevant time periods. For instance, between October 1, 1977, and April 12, 1983, a period of five and a half years, a total of 22,490 asbestos-related claims were filed against Debtor.

Another intangible benchmark, at least with respect to the period 1977 to 1979, is the Debtor's debate with Allstate Insurance Company,[25] (Northbrook) as to excluding all asbestos-related claims from Debtor's umbrella insurance coverage. Such dispute with Northbrook demonstrates the Debtor's full awareness at that time of the insurance industry's position on coverage for asbestos-related diseases or asbestosis. Northbrook flatly refused to renew any policies with the Debtor without a complete exclusion for any asbestos-related injuries.[26]

### B. Tangible Benchmarks

Tangible benchmarks are specific facts illustrative of notice as to all asbestos-related claims, be they bodily injury or property damage. The Debtor's actions vis-a-vis notice, including through its conduit, RBH, must be scrutinized in light of the developing political and legal milieu over asbestos. There is no doubt that national concern over asbestos bodily injuries and property damage was mounting swiftly and visibly subsequent to 1977.

In 1978, the issuance of policies with the asbestosis exclusion began.[27] Thereafter, in March, 1979, Debtor sued its pre–1977 excess and primary carriers in Hillsborough County, Florida, over the scope of its insurance coverage.[28] In 1979, the Environmental Protection Agency (EPA) published its first guidance document, "The Orange Book," which represented a call to arms to assist and advise building owners regarding asbestos-containing material in buildings.[29]

By letter of December 5, 1979, Aetna, the Debtor's primary insurer, advised the Debtor of its reservation of rights on the issue of a manifestation approach to coverage for asbestos bodily injury claims.[30] In its letter, Aetna strongly suggested the Debtor place all its insurers—past and present—on notice of Aetna's position. In response to this unequivocal urging, by letter dated January 2, 1980, the Debtor, through Robert Emmerton,[31] instructed RBH to notify specific insurers in the following manner:

23. For more examples of omissions see JD Exs. 4675, 4556, 4549, 18177, 4553, 18119, 18153, 4552, 4548, 4565, 4278. This list is not intended to be exhaustive.

24. See The Celotex Corporation, et al. v. AIU Insurance Co., et al., 175 B.R. 98 (Bankr.M.D.Fla. 1994).

25. Successor-in-interest to Northbrook Excess and Surplus Insurance Company, formerly known as Northbrook Insurance Company.

26. E.g., supra, Note 20.

27. For a description of the exclusion language contained in the various policies, see Celotex, supra, Note 5 at 102–04.

28. Supra, Note 21; JD Ex. 4027.

29. Envtl. Protection Agency, EPA No. C00090, Asbestos–Containing Materials in School Buildings: A Guidance Document, Parts 1 and 2. For a more thorough discussion of this document, see the Phase I opinion, supra, Note 2.

30. Letter dated December 5, 1979, from Ron LeFevre of Aetna to Robert Emmerton of JWC. JD Ex. 4142.

31. Robert Emmerton was an Assistant Vice President and Senior Corporate Counsel of JWC, and later President and General Counsel of JWC and then Celotex.

It now appears likely that all of our excess carriers may be involved in our asbestos-related litigation. Accordingly, in compliance with the policy provisions, I intend to notify all of our excess carriers of all of our pending asbestos-related cases.

\* \* \* \* \* \*

[O]n all future cases I would ask Rollins Burdick & Hunter to notify not only our first layer excess carriers, but all excess carriers which would have coverage applicable to asbestos-related claims.[32]

Notwithstanding the above directive, no post-October 1978 carriers were placed on notice at that time.

During that same period, Congress enacted the Asbestos School Hazardous Detection and Control Act (ASHDCA)[33] and in May, 1980, the first of the asbestos building claims was filed, although the Debtor was not named as a defendant. *Cinnaminson, New Jersey Board of Education v. National Gypsum Co.*, No. L-49430-79 (N.J. Super. Ct., Law Div., May 19, 1980). In August 1980, the Debtor published its Annual Report, stating coverage for asbestos-related diseases had been excluded since October 1977.

In 1981, as mandated by Section 8(b) of the ASHDCA, the Attorney General issued a report to Congress on the status of asbestos in schools.[34] The Report provided school boards with a blueprint complaint for lawsuits against asbestos manufacturers, identifying as targets, among others, Celotex and Carey Canada. On April 27, 1981, the first asbestos-related building claim was filed against the Debtor. *Evadale Independent School District v. United States Gypsum, et al.*, Civ. No. B-81-293-CA (E.D.Tex. Apr. 27, 1981).[35] In August 1981, the Debtor once again restated in its Annual Report its belief of no insurance coverage for asbestos-related diseases.

In June 1982, the first class action against the Debtor was filed. *School District of Lancaster, et al. v. Lag D'Amiante Du Quebec, Ltd.*, Nos. 1414, 1415 (Ct. of Common Pleas of Phil. Cty., Pa., June 15, 1982)("*Lancaster I*"). The same day, another class action against the Debtor and others was filed on behalf of all state governmental entities which owned buildings containing Audicote ACM, exclusive of the *Lancaster* buildings. *City of Erie v. Asarco, et al.*, No. 2554-A-1982 (Ct. of Common Pleas of Erie Cty., Pa., June 15, 1982) ("*Erie*"). Once again, the Debtor's August 1982 Annual Report reiterated the absence of insurance coverage for asbestos-related diseases.

In January 1983, a case involving more than 4,000 buildings was filed in which the Debtor was named as a defendant. *Los Angeles Unified School District v. Owens-Corning Fiberglas Corp.*, Case No. C440317 (Super. Ct., City of Los Angeles, Ca., 1983). Also that month, another purported school class action was filed against the Debtor; namely, *School District of Lancaster, et al. v. Lake Asbestos of Quebec, et al.*, No. 83-0268 (E.D. Pa., filed Jan. 17, 1983)("*Lancaster II*"). Therein, some 34,000 school districts named the Debtor and other manufacturers as liable for asbestos-containing material in public educational facilities. Collectively, then, from 1981 to 1984, in excess of 50 building claims were filed against the Debtor, of which 5 were class actions. The ad damnums in those cases, exclusive of the class actions, totalled more than $2 billion in damages. Last in 1983, the EPA published a subsequent guidance document, the "Blue Book," containing new information on asbestos in buildings.[36]

---

**32.** Debtor's Ex. No. 12001.

**33.** **Asbestos School Hazard Detection and Control Act of 1980**, Pub.L. No. 96-270, section 2, 94 Stat. 487 (codified as amended at 20 U.S.C. §§ 3601-11 (1990)). For a more detailed discussion of this publication, see the Phase I opinion, *supra*, Note 2.

**34.** **The Attorney General's Asbestos Liability Report to Congress.** Debtor's Ex. No. 1023. For a more detailed description of this publication, see the Phase I opinion, *supra*, Note 2.

**35.** This Court has rejected the idea that Debtor had a duty to give notice prior to the *Evadale* case.

**36.** Envtl. Protection Agency, Pub. No. 560/5-83-002, **Guidance for Controlling Friable Asbestos-Containing Materials in Buildings**, 3-1 (1983). For a more detailed description of this document, see the Phase I opinion, *supra*, Note 2.

Nevertheless, substantial testimony by individuals knowledgeable of Debtor's notice procedure in the operation of its insurance excess program amplifies the landscape from which this Court is able to render its decision. According to testimony, the Debtor rarely provided notice directly to its insurance companies.[37] Instead, on most occasions, the Debtor used a three-step notice process: first, the Debtor's legal department sent copies of summonses and complaints or computer listings of lawsuits to its insurance department. Second, the insurance department sent a "notice packet," which consisted of a transmittal letter, copies of the summonses and complaints or computer lists, and a listing of insurance policies and insurers, to its broker, RBH, and various primary carriers. Third, RBH sent the "notice packet" with a transmittal letter to a list of "interested underwriters" (i.e., insurance companies). However, Vernon Herrmann testified that until 1983, JWC's corporate insurance and legal departments interpreted the January 1980 Aetna/Emmerton instructions regarding notice to excess carriers to exclude the post-1977 carriers because of the asbestosis exclusions contained in these policies.[38]

Incredibly, then, the first indication of an attempt to give notice to post-October 1, 1978–October 1, 1982 excess insurers appears in a memorandum dated April 6, 1983. Therein, Emmerton, instructs Herrmann to

"[e]ffective Tuesday, April 12, 1983, . . . begin putting. . .insurance carriers, who issued products liability insurance policies to the Company subsequent to 10/1/77, on notice of all asbestos-related personal injury actions, unless it is absolutely clear from the language of the Complaint that the plaintiff is only suing for the disease of asbestosis:"[39]

Within days of the memorandum, the Debtor commenced a lawsuit for declaratory relief in the United States District Court for the District of Columbia against certain of its post-October 1978–1982 excess insurance carriers, to determine whether coverage included certain diseases caused by inhalation of asbestos.[40] Significantly, this action represented the first instance where the Debtor publicly adopted the position "asbestosis" was a single disease and, therefore, the only disease excluded from the post-October 1, 1978,–October 1, 1982, excess insurance policies. The lawsuit did not include those excess carriers for policy years October 1, 1982,–October 1, 1984, whose policies contained exclusions for "asbestosis and related diseases arising out of asbestos products."

## V. NOTICE ANALYSIS

The facts associated with the Debtor's handling of asbestos bodily injury claims and property damage claims must be viewed together when determining the issue of reasonable notice. As explained above, the Defendants issued excess comprehensive general liability insurance to the Debtor for policy periods subsequent to 1977 which contained one of two asbestosis exclusions. The introduction of the exclusions into the excess policies becomes a critical consideration, not only for the purpose of excluding certain claims, but definitely for the impact on the timing of Debtor's notice to Defendants. These excess policies also provided coverage for "physical injury to tangible property" (i.e., property damage)[41] and while the "asbestosis" exclusion is not directly applicable to the property damage coverage, nevertheless it is material

---

37. Part of Debtor's responsibility included sending copies of complaints to RBH for transmission to the excess carriers. In so doing, Vernon Herrmann, Assistant Manager for Property and Casualty for JWC, did not separate claims alleging asbestosis from claims alleging other asbestos related diseases. Herrmann simultaneously sent a copy of a form letter to Aetna, containing a postscript addressed to RBH, with instructions regarding which policies RBH was to notify of claims. RBH then sent copies of the complaint to the excess carriers with a transmittal letter identifying the carriers and the policies to which claims had been sent.

38. From October 1977 until early January 1980, Herrmann specifically instructed RBH to send all asbestos-related disease claims including those for cancer and mesothelioma to the Debtor's first layer pre–1977 excess policies.

39. JD Ex. 4213.

40. *Carey-Canada, Inc. v. California Union Ins. Co.*, No. 83–1105 (D.D.C., filed April 15, 1983).

41. *See* Phase I opinion, *supra*, Note 1.

to the reasonableness of Debtor's notice as to all claims.

Between the issuance of the first post-October 1, 1978 excess insurance policy with the asbestos exclusion, to Debtor's notice to the excess carriers on April 6, 1983, none of the post-October 1978 excess carriers received notice of any asbestosis bodily injury or asbestos property damage claim. There was no notice to the asbestos bodily injury excess carriers, notwithstanding the numerous asbestos bodily injury claims being filed with the Debtor post–1977, which claims were only being noticed to the pre–1978 carriers until April 1983.[42] Similarly, the failure to give notice was also during the time Debtor lacked primary coverage for any asbestos-related disease claims. Additionally, the single aggregate limits as to all claims prompts an apt metaphor with respect to the reasonableness of notice—the asbestos bodily injury claims were Debtor's camel and the asbestos property damage claims were its straw.

Given the absence of primary coverage for asbestos bodily injury insurance, disputes over coverage, and Debtor's filing of applications for renewal, one may conclude if Debtor believed it had excess asbestos bodily injury coverage at that time, the December 5, 1979, Aetna letter would have required the Debtor to give notice of the asbestos bodily injury claims to the excess insurance carriers for policies between 1978 and 1982. The Debtor had cause to believe the asbestos bodily injury claims would impact the post–1978–1982 excess carriers when Debtor received the December 1979 Aetna letter. The Debtor was also making asbestos claims settlements during that time without the involvement of the excess carriers.[43]

One must not lose sight of the excess insurance coverage between 1982–1984. On April 13, 1983, when the Debtor began giving notice of asbestos-related disease claims to the pre–1982 excess carriers, a year and a half of post-October 1982 excess coverage had already passed as to these later policies. At the time, Debtor had given notice to the post-October 1978–1982 excess carriers, but not to the post–1982 carriers as regards any asbestos-related claim received after April 13, 1983.

Assuming Debtor had coverage for asbestos-related diseases other than asbestosis between 1978 and 1982, Debtor argues it had the right to choose which insurance companies to put on notice in order to regulate exhaustion of policies, thus controlling which carriers to notify or which policies to exhaust. If the Debtor is correct, it still had an obligation to give reasonable notice as a condition precedent to coverage. Similarly, the Debtor's argument that notice was reasonably ordered to exhaust only its pre–1978 policies fails for the same reason. Debtor was well aware at the beginning of the post-October 1978 era of its asbestos bodily injury claims, their magnitude, and their forthcoming impact on all excess insurance coverage, and could not ignore its post-October 1978 coverage while trying to manipulate its pre-October 1978 insurance coverage. Moreover, the annual reports are material and significant as public statements of the Debtor's corporate beliefs at the time.

## A. Bodily Injury

 The more complex issue before the Court is whether Debtor's notice to asbestos bodily injury excess carriers was reasonable. The absence of asbestos bodily injury primary insurance coverage between post-October 1978 and 1982 should have sug-

---

42. The asbestos bodily injury claims during this period rose from 5,000 claims in 1980, 10,700 claims in 1981, 15,600 claims in 1982, and 20,100 claims in 1983. The Debtor's Asbestos–Related Bodily Injury Litigation Status Report to this Court set forth these figures. JD Ex. 771.

43. The fact settlements were taking place during this period of time is significant to the issue of prejudice to the insurance carriers. Under Illinois law, the excess carriers may not be interested in investigating claims unless a clear impact on their coverage is discerned. However, here, the converse may be true since there was no primary coverage for asbestos-related bodily injury claims. Admittedly, the pre–1977 primary carriers may have been defending claims which were filed post–1978, but the defense was normally under a reservation of rights, and under the facts herein, defending a claim does not take the place of notice when indemnification may be so unique. Further, the pre–1978 excess carriers were not necessarily the same as the post–1978 excess carriers.

gested to the Debtor that the excess layers would be impacted quicker by asbestos bodily injury claims, than would have occurred in those coverage years (pre-October 1978) where primary coverage for asbestos-related diseases existed. Further, Debtor had already experienced disputes over coverage with its primary and excess carriers, pre-October 1978, concerning asbestos claims where there were no asbestosis exclusions, such as in the *Hillsborough* case. Thus, Debtor had to be aware that disputes associated with post-October 1978 coverage of asbestos bodily injury claims would surely arise where Debtor changed its position as to the scope of the exclusions for asbestos-related diseases.

The Debtor's action in April 1983, i.e., suddenly taking the position it had excess insurance coverage for asbestos-related disease claims other than asbestosis for the pre–1982 years, suggests the Debtor's claims handling process could have, during the 1978–1982 period, ascertained the nonasbestosis bodily injury claims which impacted various excess policies, especially since no primary coverage existed. Yet the testimony established Debtor's asbestos bodily injury claims handling process made no distinction between asbestosis claims and other asbestos-related bodily injury claims. Further, there was no evidence to show the Debtor considered the absence of primary coverage vis-a-vis the excess insurance coverage from 1978 to 1982 in giving any notice.

If Debtor believed it had excess insurance coverage for nonasbestosis-related disease claims, there is no evidence of Debtor's due diligence in discerning such coverage before or after 1983, when the Debtor sued the post-October 1978–1982 excess insurance carriers.[44] This is especially poignant in light of the Debtor's continuous assertions of no coverage in its annual reports, applications for renewals, et cetera. It is implausible to believe from the overwhelming evidence of Debtor's ability to manage its insurance coverage, its claims, its litigations, and its noticing, that Debtor did not understand the complexities associated with its excess insurance and the requirements of notice, within the time frame of 1978–1982, especially given the absence of primary coverage for bodily injury and the single aggregate excess limits.

Mr. Herrmann's testimony regarding the Debtor's insurance claims and notification procedures demonstrates the Debtor's insurance department became increasingly sophisticated in handling asbestos claims and noticing insurance companies. Yet, by the beginning of 1983, Debtor had failed to give notice to any post–1978 excess insurance carriers. The Debtor's own disclosure statement in the general bankruptcy case and other documents reflect Debtor's ability to settle and exhaust the pre–1978 policies prior to the notice to the post-October 1978 policies, suggesting a strategy that can be viewed in several ways.

First, the evidence indicates that because of the dispute over the trigger of coverage associated with asbestos bodily injury claims, insurance companies were uncertain as to what claims they would be called upon to pay.[45] Debtor was faced with the same quandary. Therefore, it appears the Debtor and its pre–1978 insurance carriers began settling claims and resolving insurance coverage and exhaustion. The 1979 *Hillsborough* lawsuit between Debtor and its pre–1978 insurance carriers is illustrative of this dilemma. Debtor's settlement and exhaustion, as regards its pre–1978 carriers, extended into the 1980's because Debtor believed it had no coverage for asbestos bodily injuries from the post–1978 excess carriers. If the Debtor exhausted the pre–1978 insurance policies under a strategy to leave the post–1978 insurance coverage intact for some reason unfathomable to this Court, that exhaustion would be fundamentally unreasonable.[46]

---

**44.** *E.g., Carey–Canada, Inc. v. California Union Ins. Co., et al.,* 118 F.R.D. 242 (D.D.C.1986); *Carey Canada, Inc. v. California Union Ins. Co., et al.,* 708 F.Supp. 1 (D.D.C.1989); *Carey Canada, Inc. v. California Union Ins. Co., et al.,* 720 F.Supp. 1018 (D.D.C.1989); *Carey Canada, Inc. v. Columbia Casualty Co.,* 940 F.2d 1548 (D.C.Cir.1991).

**45.** For a discussion of trigger of coverage, see *The Celotex Corporation, et al. v. AIU Insurance Co., et al.,* 196 B.R. 973 (Bankr.M.D.Fla.1996).

**46.** Defendants have argued Debtor delayed in claiming coverage for post–1978 excess insurance coverage in order to allow Debtor to acquire higher and higher amounts of excess insur-

There is no contemporary evidence to suggest any exhaustion of pre–1978 insurance was related to maintaining post–1978 coverage. Second, there is little evidence Debtor had a system for determining when any policy would be exhausted. Nonetheless, the settlements, especially after the Debtor's request to be reimbursed for them from the post–1978 excess carriers without allowing them to participate, suggest fundamental prejudice in terms of right of participation of the insurance companies under Illinois insurance law.[47]

This Court believes the Debtor had sufficient information at hand when it received Aetna's letter in December, 1979, that all the excess coverage layers would be implicated by any non-asbestosis bodily injury claim. Nevertheless, as to the asbestos bodily injury coverage between 1982 and 1984, notice of which may have taken place in 1985, (Defendants label this notice as the Debtor's "second epiphany"), it is this Court's opinion, in light of the notice in April 1983 to the pre–1982 excess carriers, coupled with the Debtor's lawsuit in the District of Columbia on excess coverage for asbestos-related diseases, that the Debtor at the latest had to believe their post–1982 excess policies with the expanded asbestos exclusion, "asbestosis and related diseases arising out of asbestos products," would be impacted.

If the Debtor believed its initial epiphany of coverage was correct as to giving notice in April 1983 to the pre–1982 carriers, Debtor also had to reasonably believe its conclusion was applicable to the post–1982 excess insurance carriers and would be required for the 1982–1984 policies. From the evidence, testimony, and arguments of Debtor's counsel, there is no clear perception when notice was given to the post–1982 excess carriers as to asbestos bodily injury claims. But most assuredly, the earliest date of notice to the post–1982 excess carriers was after the policies were long in effect, and, for the most part, possibly after the policy periods had terminated. For the same reasons the notice was unreasonable to the pre–1982 excess carriers, the notice to the post–1982 carriers was unreasonable. The Debtor's duty to give notice to the post–1982 excess carriers arose in April 1983. Any notice thereafter of asbestos bodily injury claims was unreasonable.

## B. Property Damage

Scant is the evidence to persuade this Court Debtor gave notice to the excess insurance carriers as to asbestos property damage. The asbestos property damage lawsuits, in the beginning, were class actions dealing with enormous amounts of property and buildings. Once that first asbestos property lawsuit was filed in 1981 against the Debtor, followed by the class actions, there arose at least some form of inquiry notice of the impact of any asbestos property damage claim, since the Debtor knew the excess insurance policies had aggregate limits with the bodily injury claims and Debtor was taking the position there was excess asbestos bodily injury coverage and knew there was no similar primary coverage.[48]

Following the *Evadale* lawsuit, Debtor became enveloped by asbestos bodily injury claims and developed a corporate concern and awareness of the potential for property damage claims. So, each day that went forward from *Evadale* compounded the mounting pressure on the Debtor to give notice to the excess property insurers. Incredibly, it appears that only later—maybe post–1990—

ance coverage after October 1978. The evidence reflects that the Debtor substantially increased its insurance coverage from 1978 through October 1984.

**47.** *See e.g., Millers Mutual, supra,* Note 15.

**48.** The ad damnum clauses in the asbestos property damage complaints are also part and parcel of the assessment process. Admittedly, they may be a mere statement of jurisdictional amount and not in any way reflective of the actual amounts of damage; however, even as a jurisdictional forecast, the ad damnum clauses would suggest a minimum amount. More importantly, if the Debtor has a duty of due diligence in ascertaining the extent of the claims vis-a-vis its excess coverage, a significant number of property damage claims with various property damage ad damnum amounts would place one on inquiry notice of the impact of the claims on one's insurance coverage. One complaint with one ad damnum clause may be insignificant; however, ad damnums totalling over $2.2 billion should cause an insured great concern.

after this case was filed—the Debtor figured out that notice had to be given. That conclusion was untimely and unreasonable even if each piece of evidence associated with notice to property damage insurers is construed in the Debtor's favor, since there obviously existed a much earlier process for noticing claims. None of the evidence, even that introduced by the Defendants, shows any notice to the Defendants except possibly one or two, which are anecdotal at best.

In light of the foregoing, this Court finds, notwithstanding Debtor's efforts in Phase IV, no evidence to establish reasonable notice to excess insurance carriers for asbestos property damage claims. Indeed, it would take a significant leap of faith, much less proof, for this Court to conclude the Debtor had, through any means, given notice of the property damage claims at any time.

### C. Debtor's Exhaustion Argument

This Court rejects the Debtor's argument its noticing practice was somehow linked to exhaustion of various insurance policies. First, there is little in the way of convincing contemporary (pre–1984) evidence that exhaustion played a part in the noticing practice. More importantly, failure to give notice pursuant to the policies cannot be excused based on the picking and choosing of other policies to exhaust. The Debtor's evidence associated with coverage, notice and exhaustion, et cetera, displayed by charts at the end of their case, even if credible and mathematically correct or mathematically redecorated, is equally susceptible to the policies' notice prerequisites.

The Debtor failed to present any evidence to show there was any process, any consideration, any documentation that it knew which policies were being exhausted and which were not, so as to coordinate the giving of notice. Otherwise a pattern would have emerged from 1978 to April of 1983 revealing the genesis of the ultimate first epiphany of notice on that date, or even earlier, by virtue of the December 1979 Aetna letter. Further the claims numbers axiomatically suggest impact and the resultant notice requirements were or should have reasonably been understood by the Debtor. Again, as in *Eric*,[49] this Court concludes the occurrence and implications of the Aetna letter required the Debtor, as a reasonably prudent and sophisticated insured, to believe its excess insurance layer would be impaired if it believed it had coverage for bodily injury exclusive of asbestosis.

If Debtor exhausted the pre-October 1978 insurance policies under a strategy to leave the post-October 1978 insurance coverage available for another day, the evidence does not suggest why Debtor believed in the viability of such a strategy. Debtor's exhaustion theory, as submitted to this Court, is fundamentally unreasonable. It is clear from the Debtor's disclosure statement in the main case the settlements on pre–1978 policies continued far into the 1980's when asbestos-related claims would have clearly impacted the post–1978 excess carriers if Debtor believed it had coverage for nonasbestosis bodily injury claims. The fact settlements were taking place during that period of time suggests considerable reflection, if not enlightenment, on the issue of prejudice to the insurance carriers.

While there are significant comments in the Illinois case law on the primary carriers' role in dealing with claims and recognizing excess carriers may not be interested in investigating claims unless a clear impact on their coverage is discerned, in this matter, the concern would have been different because there was no primary coverage for asbestos-related bodily injury claims. Admittedly, the pre–1978 primary carriers may have been defending claims which were filed post–1978 but the defense was normally under a reservation of rights. Nonetheless, the settlements, especially after the Debtor requested to be reimbursed for them by the post–1978 excess carriers and without allowing them to participate, suggest fundamental prejudice to those insurance companies, since under applicable insurance law they had a basic right to be noticed of potential settlements.

The Debtor's focus was clearly fixed on bodily injury claims, which statistics show by

49. *Supra*, Note 2.

1981 and 1982 were coming in in droves. And the Debtor's practice, when a bodily injury claim was filed, was to notify all the pre–1978 insurance carriers. Then, according to Mr. Herrmann, when the bodily injury claims were filed in 1983, the Debtor noticed the 1982 carriers but not the 1983 carriers. The Debtor stopped mentioning no coverage in the annual report in 1982, presumably having observed the bodily injury claim flood to which it had heretofore been myopic. In any event, the Debtor's only other course would have been to abandon the position that it had any coverage for bodily injury claims and give notice as to property damage claims, since the latter would have been covered. Perhaps Debtor forgot about property damage claims, because they seemed to be of least concern. However, it is not credible from the overwhelming evidence of Debtor's ability to manage its insurance program that Debtor did not know the complexities associated with its excess insurance, the requirements of notice, the requirements associated with its implication of the facts during the period 1978–1982, such as the absence of primary coverage for asbestos bodily injury and the single aggregate limits of its excess carriers. Debtor engaged in extensive efforts every year to acquire or renew excess insurance coverage, ultimately, in the hundreds of millions of dollars. If Debtor is arguably correct that its obligation was predicated upon exhaustion of coverage, it does not dispel the requirement to give reasonable notice as a condition precedent to coverage.

### D. Debtor's Indirect Notice Argument

■ Finally, the Debtor raises the argument that its annual submissions to acquire or renew excess insurance coverage provided to RBH and from it to various post–1978 excess carriers, in fact, represented notice of asbestos bodily injury or property damage claims. However, this Court believes the documents submitted to the excess insurance companies for acquisition or renewal of excess insurance most assuredly did not give notice of property damage and, indeed, under the foregoing analysis similarly cannot be construed as notice to the bodily injury ex-

cess layer. This is particularly true based upon the evidence that the post–1978–1982 insurance companies believed their policies excluded asbestos bodily injury coverage. This Court made it quite clear during trial that Debtor's submissions were neither intended to be notice nor could the insurance companies have reason to believe they were receiving notice of any asbestos claims through such medium. Debtor was on notice of the insurance companies' understanding of the exclusion, and did not seek at the time or at trial to contradict that belief. Instead, Debtor's statements in the annual reports, annual renewals, loss data, etc., reflected that Debtor did not consider it had any form of coverage for asbestos bodily injury.

## VI. CONCLUSION

The evidence establishes the Debtor did not give notice of occurrence regarding asbestos bodily injury claims to any post-October 1978, pre–1982 excess insurance carriers until 1983 at the earliest. As to the 1982–1984 excess insurance policies, notice, if given at all, was not provided until 1985 at the earliest.[50] The notice was untimely and unreasonable in light of the Debtor's sophistication, the unexplained long delays, and the Debtor's settlement of claims without insurance carrier participation. This Court remains baffled by the Debtor's explanation it believed it had coverage for asbestos bodily injuries for the pre–1982 excess insurance in April 1983, but did not have asbestos bodily injury coverage in the post–1982 policies. There is no evidence which supports Debtor's delay in giving notice to the post–1982 excess carriers. If Debtor believed it had coverage for asbestos bodily injury in April 1983, under the pre–1982 policies then, by its own arguments, it had to have coverage under the post–1982 excess insurance policies.

Similarly, this Court finds the Debtor had cause to believe that in April 1983, the asbestos building claims would impact on all excess insurance coverage post–1978. The combination of no primary coverage for asbestos bodily injury claims, the epiphany as to asbestos bodily injury claims, at least as to the pre–1982 carriers, and the single aggre-

---

**50.** See Eric, supra, Note 3.

gate limits of the excess policies required any prudent insured to know that if they were correct (1) there was excess insurance coverage for nonasbestos bodily injury coverage; and (2) that the bodily injury claims would impact the single aggregate limits and any property damage claims during that coverage.

Of course, Debtor argues notice was not required until April 1983 to the post–1978–1982 excess carriers because it was only then that Debtor concluded it had coverage for asbestos bodily injury claims notwithstanding the asbestosis exclusion. If this later coverage scenario is correct, Debtor's acts are similarly unreasonable as to giving notice to the post–1978 carriers absent a showing of Debtor's due diligence and determination of its own insurance coverage. There has been no such showing made here and the Debtor's April 1983 epiphany remains a mystery due to the lack of illuminating documentary evidence or testimony.

One can only imagine somewhere along the line, a corporate determination was made to construe the policies so as to arguably provide insurance coverage for post–1978 bodily injury claims. That purposeful construct may have focused all of the Debtor's energies into considering the period 1978–1982, and there may have been a resultant inattention to the 1982–1984 period. For some reason, the Debtor did not take its logic forward to claim asbestosis was a single disease and, therefore, did not preclude coverage for other asbestos-related diseases, nor did it apply that logic to property damage claims.

This Court finds that in December, 1979 when Debtor advised RBH to give notice to all its insurance carriers concerning asbestos bodily injury claims, Debtor had reason to believe such claims would impact the excess insurance carriers. Debtor's duty to commence giving notice to any of its carriers arose at that time. Similarly, in April, 1983, when Debtor first gave notice to its 1978–1982 excess insurance carriers regarding non-asbestosis bodily injury claims, it had reason to believe the asbestos property damage claims would impact the excess insurance carriers and had a duty to give them notice. In sum, the Debtor's arguments that it gave timely notice could have succeeded but for two blinding factors: first, the absence of primary coverage for bodily injury claims; and second, the single aggregate limits of the excess policies. The Court finds the Debtor failed to prove its prima facie case and at certain points it did not give notice and what notice it gave was unreasonable. Accordingly, it is

ORDERED, ADJUDGED AND DECREED the Defendants' 52(c) Motions for Judgment Regarding Bodily Injury and Property Damage Late Notice be, and the same are, hereby granted. A separate Judgment shall be entered in accordance with the foregoing.